**SUTHERLAND, Appellee,**

v.

**NATIONWIDE GENERAL INSURANCE COMPANY, Appellant.**

[Cite as *Sutherland v. Nationwide Gen. Ins. Co.* (1994), 96 Ohio App.3d 793.]

Court of Appeals of Ohio,
Franklin County.

No. 93APE09–1302.

Decided Oct. 25, 1994.

794

*Mowery & Youell, Spencer M. Youell* and *David S. Kessler,* for appellee.

*Bricker & Eckler* and *Donald R. Keller; McCutchan, Druen, Maynard, Rath & Dietrich* and *Lucinda Reynolds,* for appellant.

DESHLER, Judge.

This is an appeal by defendant, Nationwide General Insurance Company ("Nationwide"), from a judgment of the Franklin County Court of Common Pleas in favor of plaintiff, Vernell Sutherland, for damages based upon claims for sex discrimination and constructive discharge, and from the trial court's judgment denying Nationwide's motions for judgment notwithstanding the verdict and/or a new trial.

Plaintiff was an employee with Nationwide from July 10, 1989, until July 5, 1991. Prior to working for Nationwide, plaintiff owned a consulting business in Virginia. Plaintiff had also previously worked for Wang Computer Corporation and Arthur Young & Company. Plaintiff's educational background includes a doctorate degree in social psychology, a master's degree in education and a bachelor's degree in education.

Information System Services ("ISS") is a department of Nationwide, consisting of approximately one thousand employees. ISS is responsible for telecommunications systems and data processing, serving the property casualty operations and life insurance companies at Nationwide.

Danny Fullerton was the vice president of ISS at the time plaintiff was hired in 1989. Below the vice president in the organizational structure at Nationwide are cabinet members, who report directly to the ISS vice president. Cabinet members constitute the senior management group of ISS. Next in the upper management hierarchy of ISS are directors, who report to cabinet members. In 1989, the cabinet consisted of, in addition to Fullerton, Gary Hall, Bob Saik, Marvin Shrimplin, Chuck Nelson, Pat Campbell and Denis Stoddard.

In April 1989, a new entity was formed within ISS, designated as Business Technology Service ("BTS"). BTS was created to develop new programs, research technology and build prototype systems for future use at Nationwide. The initial staff for BTS came from other departments within ISS. Chuck Nelson was placed in charge of BTS at its inception; Nelson reported directly to Fullerton.

Plaintiff was initially contacted in May 1989 by Herb Cunningham, vice president of personnel for Nationwide, regarding a possible job opportunity. Plaintiff was subsequently hired by Nationwide for a position within the BTS department. Her immediate supervisor was Nelson.

On June 17, 1991, plaintiff submitted a letter giving notice of her resignation from Nationwide, effective July 5, 1991. She began a position with a new employer on July 8, 1991. On January 8, 1992, plaintiff filed a complaint against Nationwide, alleging causes of action for breach of contract, promissory estoppel, constructive discharge and sex discrimination. Plaintiff subsequently filed an amended complaint, alleging an additional claim for breach of implied contract.

The matter came for trial beginning on May 12, 1993. At trial, plaintiff claimed that she had entered into a contract with Nationwide for an annual salary of $66,000, a salary grade 18, and certain benefits attendant with such a salary grade, including parking privileges, relocation benefits and immediate participation in Nationwide's management incentive compensation program. Plaintiff asserted that Nationwide's practices in compensating employees favored men, i.e., that other similarly situated males were hired into positions similar to plaintiff's position but with different salaries, salary grades and benefits. Nationwide, on the other hand, contended that its only offer to plaintiff was for a salary of $60,000, a signing bonus of $5,000 and a salary grade of 16; further, Nationwide maintained that plaintiff was not entitled to participate in its management incentive compensation program or to receive relocation benefits.

Following deliberations, the jury found in favor of plaintiff on her claims for breach of contract, promissory estoppel, sex discrimination and constructive discharge. The trial court subsequently entered judgment for plaintiff in the amount of $71,897 for the sex discrimination claim, $14,338 for the constructive discharge claim and $300,000 in punitive damages.

On June 7, 1993, Nationwide filed motions for judgment notwithstanding the verdict and/or new trial or remittitur. By decision and entry filed August 23, 1993, the trial court denied Nationwide's motions.

On appeal, Nationwide sets forth seven assignments of error for review:

"1. The trial court erred in overruling Nationwide's motions for directed verdict and judgment notwithstanding the verdict as to Sutherland's disparate treatment sex discrimination claim where she failed to establish a prima facie case by demonstrating a comparable male employee who was treated differently.

"2. The trial court erred in overruling Nationwide's motions for directed verdict and judgment notwithstanding the verdict on Sutherland's constructive discharge claim based upon a sexually abusive work environment.

"3. The trial court erred in overruling Nationwide's motions for directed verdict and judgment notwithstanding the verdict on Sutherland's sex discrimination claim in that such claim was barred by the statute of limitations.

"4. The trial court erred in overruling Nationwide's motion for judgment notwithstanding the verdict on the jury's award of punitive damages.

"5. The trial court erred in overruling Nationwide's motion for judgment notwithstanding the verdict on the jury's award of front pay.

"6. The court erred in granting Sutherland's motion in limine prohibiting Nationwide from inquiring into her past employment litigation.

"7. The trial court erred in failing to dismiss juror Bennett for cause."

Under the first assignment of error, Nationwide asserts that the trial court erred in overruling Nationwide's motions for directed verdict and judgment notwithstanding the verdict regarding plaintiff's sex discrimination claim. Specifically, Nationwide contends that plaintiff failed to establish a prima facie case of discrimination.

R.C. 4112.02(A) provides that it is an unlawful discriminatory practice for any employer "because of the * * * sex * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." The Ohio Supreme Court has held that "federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e *et seq.*, Title 42, U.S.Code, is generally applicable to cases

involving alleged violations of R.C. Chapter 4112." *Plumbers & Steamfitters Commt. v. Ohio Civil Rights Comm.* (1981), 66 Ohio St.2d 192, 196, 20 O.O.3d 200, 202, 421 N.E.2d 128, 131.

In *Frank v. Toledo Hosp.* (1992), 84 Ohio App.3d 610, 615, 617 N.E.2d 774, 778, the court observed:

"As to 'disparate treatment,' our courts have adopted the formula set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 802–805 [93 S.Ct. 1817, 1824–1826, 36 L.Ed.2d 668, 677–679] (for claims brought pursuant to Title VII), as the analysis for judicial inquiry into complaints alleging disparate treatment in violation of R.C. Chapter 4112. Although the *McDonnell Douglas* formula was developed in response to allegations of racial discrimination in hiring, both federal and Ohio courts have found the formula to be flexible enough to fit the varying factual allegations in Title VII and R.C. Chapter 4112 cases pertaining to sex discrimination and discriminatory discharge, and have modified it accordingly." (Citations omitted.)

■ A complainant in a Title VII case must carry the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green, supra* at 802, 93 S.Ct. at 1817, 36 L.Ed.2d at 677. "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dept. of Community Affairs v. Burdine* (1981), 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207, 215. If the plaintiff establishes a prima facie case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas, supra,* 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 678. Finally, "should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. at 1093, 67 L.Ed.2d at 215.

■ In ruling upon a motion for judgment notwithstanding the verdict, the test to be applied by the trial court is the same test to be applied concerning a motion for directed verdict. *Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 430, 344 N.E.2d 334, 338. Under this test, the evidence adduced at trial and the facts set forth by admissions in the pleadings and record "must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied." *Id.* Further, "[n]either the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions." *Id.*

Nationwide contends that the trial court erred in concluding that plaintiff established a prima facie case of discrimination. More specifically, Nationwide asserts that plaintiff failed to establish that a comparable male employee was treated differently than she was. In support, Nationwide relies primarily upon a Sixth Circuit federal case, *Mitchell v. Toledo Hosp.* (C.A.6, 1992), 964 F.2d 577. In *Mitchell,* a race and age discrimination/termination case, the court held:

"As the Sixth Circuit has frequently phrased the requirements of a *prima facie* claim of disparate treatment using such a 'comparable non-protected person was treated better' element as one of the requisites, the plaintiff must produce evidence which at a minimum establishes (1) that he was a member of a protected class and (2) that for the same or similar conduct he was treated differently than similarly-situated non-minority employees. * * *

" * * *

"It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly situated *in all respects.* * * * Thus, to be deemed 'similarly situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. * * * " (Citations omitted.) *Id.* at 582–583.

Nationwide's argument, based upon the *Mitchell* case, is essentially twofold: the three males identified by plaintiff as situated similarly to her, Bob Saik, Denis Stoddard and Suchindran Chatterjee, had different supervisors than plaintiff, and the males at issue were not subject to the same standards, nor did they engage in the same conduct, as plaintiff.

Concerning the issue of supervisors, Nationwide apparently contends that plaintiff must have shown that other similarly situated males had the same immediate supervisor as plaintiff. While the *Mitchell* case does not expound upon the meaning of "same supervisor," we find unpersuasive the narrow interpretation suggested by Nationwide.

A similar issue was raised in *Sisson v. Bd. of Regents, Univ. of Michigan* (1989), 174 Mich.App. 742, 436 N.W.2d 747. In *Sisson,* the plaintiff, a black male, brought a claim for race discrimination against his employer following plaintiff's discharge for theft. The plaintiff identified three white employees who were also accused of theft but not discharged. The defendant-employer contended that the three white employees were not similarly situated because of differences in

departments and supervisors. The court rejected the employer's argument, holding that:

"Although the white employees worked in different departments under different supervisors, this alone will not preclude a finding of dissimilar treatment. The law requires only that the co-workers have similarity, not identity, in place and time. * * *" *Id.* at 747, 436 N.W.2d at 749–750.

We agree with the court in *Sisson* that similarity, rather than identity, is the proper inquiry. In the present case, the evidence indicated that Danny Fullerton, the vice president of ISS, was responsible for the decision not to provide plaintiff with director-level benefits at the time she was hired. Fullerton, as ISS vice president, was also involved in the hiring of Stoddard and Chatterjee to director positions. Stoddard reported directly to Fullerton. The testimony indicated that Fullerton was directly involved in the creation of the position which Chatterjee assumed at the time of his hiring, *i.e.*, director of distributed systems services. The position was assigned a salary grade 18 and Fullerton approved the decision to assign Chatterjee the title of director. Fullerton's relationship to the employees at issue indicated sufficient evidence of similarity, and we reject the contention that plaintiff failed to show a prima facie case because the alleged comparables did not report directly to plaintiff's immediate supervisor.

Nationwide further asserts that plaintiff cannot establish a prima facie case of discrimination because, it is contended, the alleged comparable males were hired into preexisting director-level positions while plaintiff was hired into a new position for which a salary grade had to be established before she began. We are unpersuaded.

Our difficulty with Nationwide's argument is that it treats the circumstances of a hiring practice as an issue of law which, presumably, would always militate against a finding of discrimination. Thus, under Nationwide's reasoning, as long as an employer hired a member of a protected class, *i.e.*, a female, to a newly created position, while hiring men only for already existing positions, a claimant could never establish a prima facie case of disparate treatment. Rather than a rule of law, we view such circumstances as issues of fact which, in an individual case, may or may not be evidence showing discrimination. Stated otherwise, the fact that the employer in this case hired a female to a newly created position, while other males were hired only to existing positions with higher compensation and benefits, may have been one factor from which the jury inferred that Nationwide engaged in discrimination. Regardless of how the jury viewed this evidence, we find no merit to the contention that evidence of a particular hiring practice, as a matter of law, precludes a claimant from making out a prima facie case of discrimination.

The determinative issue before this court is whether there was sufficient evidence to support plaintiff's claim upon which reasonable minds may reach different conclusions. A review of the record indicates that there was competent evidence to support the jury's verdict.

Construing the evidence most strongly in favor of the nonmoving party, we summarize as follows the evidence supporting the jury's verdict and the trial court's denial of Nationwide's motions for judgment notwithstanding the verdict and new trial. Plaintiff was contacted by Nationwide from her home in Virginia in May 1989, regarding a possible position. Plaintiff travelled from Virginia to Columbus to talk with Nationwide representatives. Plaintiff spoke with Chuck Nelson about hiring at a director-level, grade 18 position, with an annual salary of $66,000. As a result of these talks, plaintiff began closing down her consulting business in Virginia in order to move to Columbus.

Plaintiff was subsequently contacted by Nelson, who told her that his boss, Danny Fullerton, had a problem with plaintiff starting at the salary grade and benefits previously discussed. Nelson told plaintiff that there was an "equity problem" because a recently hired male employee, Denis Stoddard, who was a close personal friend of the president of Nationwide, had been hired at a grade 17, director position. Fullerton was apparently concerned that Stoddard might become upset if plaintiff received a higher salary grade inasmuch as plaintiff and Stoddard had similar educational backgrounds. Further, Fullerton was concerned that the proposed salary would place plaintiff at the same or higher salary than some of the other current directors.

Nelson told plaintiff that she would be hired at a director level position with a grade 17, and a starting salary of $60,000, with a $5,000 signing bonus; he assured plaintiff that the benefits would be the same as for a grade 18 director. When plaintiff went to Nationwide to fill out an application, Nationwide employee Barb Tucker showed her an offer letter for a grade 17, director-level position. Tucker told plaintiff that she could not give her the letter at that time.

On July 6 or 7, 1989, plaintiff was told by another Nationwide employee, Rich Gandarilla, that the job would have to be temporarily designated at grade 16. Plaintiff was assured that this position would still be at a director level, and that she would eventually receive a grade 18 position.

Plaintiff began her employment with Nationwide on July 10, 1989. The evidence was undisputed that plaintiff and her immediate supervisor, Nelson, had a difficult relationship. During a business trip to Boston, Nelson stood up in a restaurant and began shouting at plaintiff. After returning from this trip, Nelson told plaintiff's husband that plaintiff was a "bitch." At the Nationwide office, Nelson once ordered plaintiff to follow him into an elevator, where he raised his fist at her and began threatening her. There was also evidence that Nelson

would phone plaintiff at home during evening hours and he "would explode into an anger or rage." Nelson was subsequently treated for an alcohol problem.

Plaintiff informed personnel at Nationwide about these incidents with Nelson. She eventually made requests for a transfer from the BTS department. She first requested a transfer in the spring of 1991 because, although Nelson had undergone treatment for alcoholism at that time, he continued to berate her and phone her at home. Plaintiff spoke with Bob Saik, the vice president of ISS at that time, about the situation, telling him that she could not continue to work for a supervisor who was demeaning to her in front of her peers at staff meetings. Nationwide denied her transfer requests. Saik told her that she did not have any options regarding a move to another position at that time.

During the time of her employment with Nationwide, plaintiff received above average evaluations regarding her work performance. There was evidence indicating that plaintiff performed director duties after she was hired despite the fact that she was not recognized as a director by Nationwide. Plaintiff's supervisor, Nelson, reviewed her performance based upon an appraisal form utilized for evaluating directors. Plaintiff pursued Nationwide's equity procedure, an internal grievance mechanism, concerning the title, salary grade and benefits she felt she had been promised when she started her employment. Plaintiff wrote a letter to Nelson initiating the procedure. Nelson told her that if she followed through with the procedure it would ruin her career. Plaintiff then spoke with Denis Stoddard, Saik and Hugh Murphy, Nationwide's EEO officer, about the equity procedure. Plaintiff was encouraged to proceed in a more informal manner. After becoming frustrated by this approach, plaintiff subsequently drafted a document regarding the equity procedure and submitted copies to Stoddard and Murphy. Plaintiff never received a written response to her attempts to invoke the equity procedure regarding these matters; however, she eventually received a grade 18 designation in November 1990.

She later attempted to pursue the other remaining issues, including relocation benefits, parking privileges and a director's office. Although an internal memorandum indicated that paperwork was being prepared for relocation expenses and that a request would be made for parking privileges, plaintiff was subsequently informed by Nationwide that she was considered a "local candidate," and thus not eligible for relocation benefits. She also never received parking privileges. Nelson testified that in February 1991, he sent a memorandum to Saik, recommending that plaintiff receive a salary increase of ten percent in order to make her salary equitable with other director salaries at ISS. According to Nelson, Saik refused the request because "at this time he felt that she was constantly demanding new things, and this was just one more thing."

In addition to the specific incidents previously noted involving her supervisor, plaintiff presented evidence that Nationwide personnel created a hostile work environment for her based upon attitudes by management personnel regarding her appearance. During her employment at Nationwide, plaintiff was told by Marvin Shrimplin, a member of the cabinet, that her skirts were too short. Shrimplin also told her that Fullerton had commented that her hair was too short. Chuck Nelson told plaintiff that she dressed "too nice" and that she should not be so articulate. Nelson also told plaintiff that she should quit attending law school because it was hurting her career. Before cabinet meetings, other male members told jokes concerning sex-related matters in her presence.

There was evidence indicating that plaintiff was at least as qualified as other males hired for director-level positions. Denis Stoddard was hired approximately a month before plaintiff as a director with a salary grade 17. Stoddard received parking privileges within two or three months of the time he was hired. He was also placed in Nationwide's management incentive program after one year at Nationwide. Stoddard's background was similar to plaintiff's. Stoddard had his own human resource development consulting firm prior to joining Nationwide. His educational background included a bachelor's degree in public administration, a master's degree in sociology and a doctorate degree in social psychology. As noted above, at the time of plaintiff's hiring, Fullerton expressed an "equity concern" with plaintiff receiving the same or higher salary as Stoddard.

Shortly after plaintiff was hired, Nationwide also hired Suchindran Chatterjee as a director, grade 18, with a starting annual salary of $68,000 and a $5,000 signing bonus. He received parking privileges in the same manner as Stoddard. Chatterjee was almost immediately accorded the ability to participate in the incentive bonus program. Chatterjee, who was residing in a suburb of Cincinnati when he was recruited by Nationwide, also received relocation benefits. After plaintiff left Nationwide, Chatterjee assumed plaintiff's job duties as ISS director of research. At the time he assumed plaintiff's former duties, Chatterjee was receiving an annual salary of $71,400. Four months later, Chatterjee's annual salary increased to $76,400. There was evidence indicating that plaintiff was as qualified as the man who replaced her and who received a raise in salary shortly after assuming her duties.

There was testimony by Daniel Lahner, an industrial consultant who provided services for Nationwide, that there exists a perception among women at Nationwide that it is more difficult for women to get ahead than it is for men. He viewed this as a corporate-wide problem.

■ Upon review of the record, there was evidence upon which the jury could have concluded that Nationwide failed to provide plaintiff the position, salary grade and benefits that she was led to believe that she would receive; that

plaintiff, although as qualified as other similarly situated males placed in substantially equal director positions, did not receive the same title, compensation and benefits as these individuals; and that plaintiff was harassed and subjected to a hostile work environment by her supervisor and other Nationwide personnel. We find that there was sufficient evidence to support an inference that, but for plaintiff's sex, she would have received a different salary, salary grade and benefits. In sum, there existed substantial evidence upon which reasonable minds could differ as to whether plaintiff suffered discrimination because of her sex.

The first assignment of error is overruled.

■ Under the second assignment of error, Nationwide argues that the trial court erred in overruling Nationwide's motions for directed verdict and judgment notwithstanding the verdict regarding plaintiff's claim for constructive discharge.

In *Neal v. Hamilton Cty.* (1993), 87 Ohio App.3d 670, 676, 622 N.E.2d 1130, 1135, the court noted:

"Before a claim of constructive discharge can be submitted to the jury, the plaintiff must prove that her working conditions were so difficult or unpleasant that a reasonable person would have felt compelled to resign. * * * Such a determination requires a case-by-case analysis and 'an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct on the employee.' * * *" (Citations omitted.)

In the present case, as noted under the previous assignment of error, the evidence indicated that plaintiff was subject to harassment and abuse by her supervisor, Charles Nelson, on various occasions. On a business trip to Boston, Nelson stood up in a restaurant, pointed his finger at plaintiff and yelled at her, "I am pissed off at you. I am God damned pissed off at you." On returning from the trip to Boston, Nelson told plaintiff's husband that "Your wife is a bitch. She is a real God damned bitch." At the Nationwide office, Nelson once ordered plaintiff to follow him into an elevator, at which time he raised his fist and began shouting at her. Plaintiff felt panicked and began looking for the button to open the elevator. During her employment at Nationwide, plaintiff participated in the company's tuition reimbursement program and attended law school. On different occasions, Nelson told plaintiff that she should quit law school. Nelson repeatedly telephoned plaintiff at home and would raise his voice at her over the phone.

There was also evidence indicating that Nationwide was indifferent to the treatment received by plaintiff. Barbara Tucker, an assistant personnel manager, whose duties included following up on complaints of abuse or harassment against employees, was told by plaintiff of the incident in the elevator involving plaintiff and Tucker. Tucker acknowledged that she "probably did not" docu-

ment plaintiff's complaint concerning the incident. Tucker indicated that she told Denis Stoddard about the incident, but that Stoddard's response was that he had already heard about it. Stoddard testified that plaintiff told him about the elevator incident and the incident in the restaurant when Nelson stood up and shouted at plaintiff. Stoddard, while acknowledging that plaintiff was upset about the "elevator incident," did not document the incident.

Nelson subsequently received treatment for alcoholism. There was conflicting testimony concerning the situation at Nationwide after Nelson returned from treatment. While Stoddard denied that plaintiff complained about Nelson's behavior after treatment, Daniel Lahner, an industrial psychologist, testified that plaintiff told her in December 1990 that Nelson was acting like his old self again. Nationwide's EEO officer, Hugh Murphy, testified that plaintiff told him that she feared for her physical safety when she was around Nelson. Murphy was aware of the fact that Nelson had placed some phone calls to plaintiff's house, during which time the calls "started out normal and Chuck would explode into an anger or rage." Murphy's advice to plaintiff was "not to place yourself in a position where the two of them were alone, where she could be harmed if he flew into a rage, to try and keep meetings open * * * in effect to remove herself from harm's way." Murphy acknowledged that he never talked to Nelson about the situation nor did he talk to any other supervisor.

Danny Fullerton acknowledged that plaintiff complained about Nelson's behavior. Following Nelson's return from rehabilitation, Fullerton failed to inquire of plaintiff whether she was continuing to have difficulties with Nelson. Specifically, Fullerton testified as follows:

"Q. Did you ever go back to Ms. Sutherland and ask her whether or not she was continuing to have any problems such as she had before?

"A. No.

"Q. Did you instruct anybody in personnel, either Mr. Stoddard or Miss Tucker, to follow-up on those complaints because they might be recurring after he returns?

"A. Mr. Stoddard was given the assignment and responsibility to monitor Chuck's rehabilitation program after he returned.

"Q. Did you ask him to monitor to see whether or not there was any continuing sexual harassment with Dr. Sutherland?

"A. Not specifically, no."

In the spring of 1991, plaintiff requested a transfer "because even though Chuck [Nelson] was working on his alcoholic problem, his behavior was still very belligerent, and he still continued to yell at me and call me at home at night."

Despite Nationwide's knowledge that Nelson had been abusive to plaintiff in the past, Nationwide kept plaintiff under Nelson's supervision and refused to consider a transfer.

Upon review of the record, there was sufficient evidence upon which the trier of fact could have concluded that plaintiff's working conditions were so unpleasant that a reasonable employee would have felt compelled to resign. *Neal, supra,* 87 Ohio App.3d at 676, 622 N.E.2d at 1135.

Nationwide's major contention is that the timeliness of plaintiff's resignation relative to the adverse treatment is an important factor in the constructive discharge analysis. Nationwide asserts that there was not substantial evidence of objectively intolerable working conditions at the time plaintiff resigned. Specifically, while not disputing the existence of certain incidents themselves, Nationwide contends that plaintiff's resignation occurred over one year after the "elevator incident," seven months after the receiving the salary grade 18, and six months after she was denied relocation benefits.

In *Valdez v. Los Angeles* (1991), 231 Cal.App.3d 1043, 282 Cal.Rptr. 726, the court addressed a similar contention, where the defendant-employer argued that the fact that the employee remained on the job for over a year after the beginning of the alleged abusive conditions demonstrated, as a matter of law, that the conditions were not intolerable. The *Valdez* court had occasion to review federal treatment of this issue, holding that there was no judicially created outer limit on how long an employee has in which to resign following the onset of allegedly intolerable working conditions. Specifically, the court held that:

"[S]uch a judicially created time limit conflicts with federal cases which treat the length of time an employee remains on the job under allegedly intolerable conditions as one circumstance within the 'totality of circumstances' to be considered by the trier of fact. * * * For example, in *Nolan v. Cleland* * * * [ (CA 9, 1982), 686 F.2d 806,] 813–814, the court held a showing of four incidents of discrimination over a two year period created an issue of fact for trial. In *Clark v. Marsh* * * * [ (C.A.D.C.1981) 665 F.2d 1168,] 1170, the plaintiff endured a pattern of discriminatory treatment for over five years before resigning. * * * California courts too have upheld claims of constructive discharge where the intolerable conditions complained of began more than a year before the plaintiff resigned. * * *

"The length of time the plaintiff remained on the job is relevant in determining the severity of the impact of the working conditions but does not as a matter of law prevent the plaintiff from proceeding with a claim for wrongful discharge. Some employees may stay on the job and endure very difficult circumstances that might have caused others similarly situated to quit sooner. Financial circumstances may not allow the employee the luxury of resigning before finding other

employment. But the fact that for a time circumstances prevented the employee from resigning certainly does not decrease the burden the employer has placed on him. * * *

"The question for the trier of fact in wrongful discharge cases is what a reasonable person in the employee's position would have done. * * * Applying * * * [an] arbitrary outer limit in every case precludes the trier of fact from considering whether an employee had a reasonable basis for remaining on the job despite the employer's allegedly intolerable actions. * * * " (Citations omitted.) *Valdez, supra,* 231 Cal.App.3d at 1058, 282 Cal.Rptr. at 734–735.

 We agree with the conclusion of the *Valdez* court that the length of time that a plaintiff remains on the job does not, as a matter of law, preclude a plaintiff from presenting a claim for constructive discharge. Similar to the facts of *Valdez,* the plaintiff in the instant case attempted to take steps during her employment to resolve the situation, including the exploration of informal channels within Nationwide and attempts to transfer out from the supervision of Nelson. As previously noted, there was evidence which, if believed by the jury, indicated that Nationwide ignored plaintiff's concerns. It was within the province of the trier of fact to determine whether plaintiff was constructively discharged from her employment, and we conclude that the trial court did not err in overruling Nationwide's motions for judgment notwithstanding the verdict or new trial on this issue.

Nationwide's second assignment of error is overruled.

 Nationwide's third assignment of error contends that plaintiff's sex discrimination claim was barred by the statute of limitations. Specifically, Nationwide asserts that a one-year statute of limitations, as provided under R.C. 2305.11(A), is applicable because plaintiff's sex discrimination claim was brought pursuant to R.C. 4112.99. Nationwide argues that all of the allegedly discriminatory employment decisions challenged by plaintiff arose at the time of her hire; thus, Nationwide maintains, the statute of limitations began to run on July 10, 1989, and plaintiff's failure to file her sex discrimination claim until January 8, 1992, therefore exceeded a one-year limitations period.

Subsequent to the filing of briefs and oral argument in the instant case, the Ohio Supreme Court decided the issue presented under Nationwide's assignment of error. In *Cosgrove v. Williamsburg of Cincinnati Mgt. Co., Inc.* (1994), 70 Ohio St.3d 281, 638 N.E.2d 991, syllabus, the Ohio Supreme Court held that "R.C. 4112.99 is a remedial statute, and is thus subject to R.C. 2305.07's six-year statute of limitations."

Based upon the holding in *Cosgrove,* Nationwide's third assignment of error is overruled.

Under the fourth assignment of error, Nationwide asserts that the trial court erred in overruling its motion for judgment notwithstanding the verdict on the jury's award of punitive damages.

 Under Ohio law, an award of punitive damages is available upon a finding of actual malice. *Calmes v. Goodyear Tire & Rubber Co.* (1991), 61 Ohio St.3d 470, 473, 575 N.E.2d 416, 419. The syllabus of *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, provides:

"Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." (Emphasis *sic.*)

 We have previously noted evidence indicating that plaintiff's supervisor, Nelson, harassed her and engaged in abusive behavior on numerous occasions, that Nationwide had knowledge of Nelson's actions but placed plaintiff back under Nelson's supervision after his rehabilitation, and that Nationwide refused plaintiff's requests for a transfer from Nelson's supervision despite knowledge of continued harassment. The abusive treatment of plaintiff by Nelson was not disputed. The record in this case contains sufficient evidence upon which reasonable minds could differ regarding whether Nationwide consciously disregarded plaintiff's rights or safety. Accordingly, Nationwide's contention that the jury's award of punitive damages was against the manifest weight of the evidence is not well taken.

The fourth assignment of error is overruled.

Under the fifth assignment of error, Nationwide contends that the trial court erred in overruling its motion for judgment notwithstanding the verdict on the jury's award of front pay.

In the present case, the jury found that plaintiff was constructively discharged and that she suffered future lost wages in the amount of $14,338 for the period of July 5, 1991 through December 31, 1991. Nationwide argues that the issue of front pay is governed by the Ohio Supreme Court's decision in *Worrell v. Multipress, Inc.* (1989), 45 Ohio St.3d 241, 543 N.E.2d 1277, and that, under *Worrell,* an award of front pay is limited to the interim period between the time an employee is discharged and the time the employee obtains new employment; thus, Nationwide asserts, because plaintiff's resignation was effective July 5, 1991, and she began working for her new employer on July 8, 1991, she was not entitled to any award of front pay. Nationwide further argues that evidence that plaintiff's new position paid a higher salary than what she was making at Nationwide at the time of her resignation also precludes an award of front pay.

In *Worrell,* the Ohio Supreme Court recognized that "front pay" is an equitable remedy designed to compensate employees in situations where reinstatement would be impractical or inadequate. *Id.,* 45 Ohio St.3d at 246, 543 N.E.2d at 1282. Factors to be considered in determining such an award are:

"(1) the age of the employee and his or her reasonable prospects of obtaining comparable employment elsewhere; (2) salary and other tangible benefits, such as bonuses and vacation pay; (3) expenses associated with finding new employment; and (4) the replacement value of fringe benefits, such as an automobile and insurance for a reasonable time until new employment is obtained." (Footnotes omitted.) *Id.* at 247, 543 N.E.2d at 1283.

As noted by Nationwide, the *Worrell* court stated that damages for front pay are "temporary in nature, as they are designed to assist the discharged employee during the transition to new employment of equal or similar status." *Id.* *Worrell* involved a wrongful discharge resulting from a breach of an employment contract. The court held that "as a result of breach of an employment contract where an employee has been wrongfully discharged, front pay, or lost future wages, may be awarded as compensation between the date of discharge and reemployment in a position of equal or similar status." *Id.* The court noted, however, that "[o]ur decision today does not restrict the award of front pay for a more extended period of time in age discrimination suits filed pursuant to R.C. Chapter 4112, Civil Rights Commission." *Id.*

In the present case, the plaintiff presented evidence, and the jury made a finding, that had plaintiff not been discriminated against, she would have been entitled to participate in Nationwide's management incentive compensation program. The jury further found that the actual percentage that plaintiff would have received was 29.5 percent. The trial court, in holding that front pay was properly awarded to make plaintiff whole, noted that "[p]laintiff's new employment did not include a management incentive compensation program thereby reducing the compensation Plaintiff would receive."

We find no error in the trial court's determination. Nationwide essentially contends that the fact that plaintiff immediately obtained new employment and received a higher base salary after leaving Nationwide precludes an award of front pay. However, the purpose of front pay is to make the injured party whole. *Worrell, supra,* 45 Ohio St.3d at 246, 543 N.E.2d at 1282. *Worrell* does not stand for the proposition that a claimant should be penalized for mitigating damages. To the extent that the new employment does not make the claimant whole, front pay is appropriate. In the present case, the evidence indicated, as noted by the trial court, that plaintiff's new position did not include participation in a management incentive compensation program. Plaintiff also submitted evidence regard-

ing tuition reimbursement she would have been entitled to receive had she remained at Nationwide. The record indicates that there was evidence justifying the award of front pay for benefits plaintiff would have received but for the fact that she was constructively discharged.

Nationwide's fifth assignment of error is not well taken and is overruled.

Under the sixth assignment of error, defendant argues that the trial court erred in granting plaintiff's motion *in limine* to exclude evidence of her past employment litigation. Specifically, defendant contends that it should have had the opportunity to cross-examine plaintiff at trial concerning her termination from a former employer, Arthur Young & Company, which resulted in a claim brought by plaintiff against that employer.

Initially, we note that "[a]n order granting or denying a motion *in limine* is a tentative, preliminary or presumptive ruling about an evidentiary issue that is anticipated but has not yet been presented in its full context." *Starinki v. Pace* (1987), 41 Ohio App.3d 200, 204, 535 N.E.2d 328, 332. Thus, "an appellate court need not review the propriety of such an order unless the claimed error is preserved by an objection, proffer, or ruling on the record when the issue is actually reached and the context is developed at the trial." *Id.* In the present case, as noted by plaintiff, Nationwide failed to create a record on appeal of this issue as it failed to preserve an objection or proffer to the trial court the substance of the evidence it sought to admit. Rather, we are left with Nationwide's bare assertion in its brief that evidence concerning plaintiff's litigation against a former employer would have been important to the jury's determination of plaintiff's credibility. Nationwide's failure to preserve this issue by raising an objection or proffer constitutes a waiver.

Even assuming that Nationwide had properly preserved this issue on appeal, and further assuming that such evidence had probative value, we nevertheless agree with the trial court's determination that the probative value of evidence regarding a prior lawsuit was outweighed by its prejudicial value. It is well settled that the scope of cross-examination and the admissibility of evidence during cross-examination are matters which rest in the sound discretion of the trial judge and, thus, such rulings will not be disturbed on appeal in the absence of clear and prejudicial abuse of discretion. *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 163, 17 O.O.3d 98, 100, 407 N.E.2d 490, 493. Nationwide has failed to show an abuse of discretion on the part of the trial court in excluding the evidence at issue.

Nationwide's sixth assignment of error is overruled.

Under the seventh assignment of error, defendant asserts that the trial court erred in failing to excuse a juror for cause, as the juror had "definite

opinions" and "definite knowledge" as to the effect of alcoholism on a person's actions, based upon personal experience and research.

The record indicates that, during voir dire, the jurors were told by counsel for Nationwide that plaintiff's supervisor at Nationwide, Nelson, had gone through treatment for alcoholism. The jurors were asked if that fact would cause them to more likely give weight to plaintiff's version of what occurred at the work place (than to the testimony of Nelson), or to believe that Nelson's memory of events would be clouded. One of the jurors stated that she had helped one of her employees get into drug and alcohol rehabilitation, and that she had "definite opinions on or definite knowledge of what * * * [alcohol] does to a person's actions." The juror was then asked by counsel whether she would have difficulty giving Nelson's testimony weight because of his treatment. The juror indicated that it would be in the back of her mind that he was someone with an alcohol problem.

Counsel for Nationwide subsequently asked the court to excuse the juror for cause. The trial court then asked the witness whether her views concerning individuals with alcohol problems would preclude her from being able to return a fair and impartial verdict. The juror stated that it would not, and that she was "certainly willing to keep an open mind and listen to the evidence." The trial judge further inquired whether the juror would be able to put aside her own particular personal opinion on the issue and to apply the law to the facts. The juror responded that she "could put that aside." Based upon the juror's responses, the trial court declined to excuse her for cause.

The determination whether a prospective juror should be disqualified is a matter within the discretion of the trial court. *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301, 1308. Thus, such a determination by the trial court will not be reversed on appeal absent an abuse of discretion. *Id.*

In the present case, the trial court "had the opportunity to observe the demeanor of the prospective juror and evaluate firsthand the sincerity of her responses to questions." *Id.* The juror indicated that she could put aside her personal opinions and apply the law as instructed. We find no abuse of discretion by the trial court in failing to excuse the juror for cause. Defendant's seventh assignment of error is overruled.

Based upon the foregoing, Nationwide's seven assignments of error are overruled and the judgment of the trial court is hereby affirmed.

*Judgment affirmed.*

WHITESIDE, P.J., and PETREE, J., concur.