**MYERS, Appellant,**

**v.**

**GOODWILL INDUSTRIES OF AKRON, INC., Appellee.**

[Cite as *Myers v. Goodwill Industries of Akron, Inc.* (1997), 122 Ohio App.3d 294.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 18085.

Decided Aug. 6, 1997.

Affirmed in part, reversed in part, and remanded.

*Nancy Grim*, for appellant.

*Michele Morris*, for appellee.

BAIRD, Judge.

Plaintiff-appellant Theresa M. Myers appeals from the decision rendered in the Summit County Court of Common Pleas granting summary judgment to defendant-appellee Goodwill Industries of Akron, Inc. ("Goodwill") on Myers's claims of sex discrimination and negligent retention. We affirm in part and reverse in part.

Myers was hired by Goodwill on June 3, 1991, to work as a security coordinator. Her supervisors were Gina Shook and Terry McCarty. After about one year, Myers was promoted to cashier coordinator. According to Myers, McCarty continually abused her by yelling at her, belittling her, and making conflicting and demeaning demands on her.

As part of a general reduction of its workforce, Goodwill laid off Myers on September 17, 1993, eliminated her job, and redistributed her duties to a male employee. In December 1993, Goodwill re-established the position, entitling it "head cashier." Myers did not apply for the position, and instead took a job with a medical center as a nurse's aide. Goodwill hired a woman under the age of forty to be its head cashier.

On September 16, 1994, Myers filed a complaint against Goodwill,[1] alleging sex discrimination and age discrimination under R.C. 4112.99 and 4101.17,[2] and negligent retention. Myers later amended her complaint to allege sex discrimination in violation of Title VII of the Civil Rights Act, Section 2000e *et seq.*, Title 42, U.S.Code, and age discrimination in violation of the Age Discrimination in Employment Act, Section 621 *et seq.*, Title 29, U.S.Code. Myers alleged that McCarty harassed her throughout her employment at Goodwill and that Goodwill was negligent in permitting him to continue as a supervisor there despite having

---

1. Myers also named Terry McCarty as a defendant. However, all proceedings with respect to McCarty were stayed by his bankruptcy petition prior to the trial court's entry of judgment in this case.

2. The substance of former R.C. 4101.17 is now set forth in R.C. 4112.14.

notice of his behavior. Myers characterizes Goodwill's discharge of her and the circumstances surrounding its reposting of her old position as continuations of prior discriminatory harassment.

Goodwill moved for summary judgment on October 10, 1995. Myers responded and Goodwill replied. The trial court referred the matter to a magistrate. The trial court ultimately found that all of Myers's discrimination claims failed because Myers failed to produce evidence that Goodwill's reasons for discharging her were merely a pretext for unlawful discrimination. The trial court also found that the failure of Myers's discrimination claims required summary judgment for Goodwill on the negligent retention claim, because by not being able to prove discrimination, Myers was unable to demonstrate that she suffered any damages from Goodwill's alleged negligence in retaining McCarty in a supervisory position.

Myers appeals, assigning two errors.

## I

In reviewing a trial court's entry of summary judgment, an appellate court applies the same standard used by the trial court. *Perkins v. Lavin* (1994), 98 Ohio App.3d 378, 381, 648 N.E.2d 839, 840–841. Pursuant to Civ.R. 56(C), summary judgment is proper if (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party. *State ex. rel. Howard v. Ferreri* (1994), 70 Ohio St.3d 587, 589, 639 N.E.2d 1189, 1192–1193.

Doubts must be resolved in favor of the nonmoving party. *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 686, 653 N.E.2d 1196, 1201–1202. Since only legal questions exist, no special deference is to be afforded the trial court upon a review of an entry of summary judgment. *Lorain Cty. Bd. of Commrs. v. United States Fire Ins. Co.* (1992), 81 Ohio App.3d 263, 267, 610 N.E.2d 1061, 1063–1064. We will, therefore, review the matter *de novo. Pennsylvania Lumbermens Ins. Corp. v. Landmark Elec., Inc.* (1996), 110 Ohio App.3d 732, 743, 675 N.E.2d 65, 73; *Tyler v. Kelley* (1994), 98 Ohio App.3d 444, 446, 648 N.E.2d 881, 882. In viewing disputed evidence, we construe all facts in the nonmoving party's favor. *Turner v. Turner* (1993), 67 Ohio St.3d 337, 341, 617 N.E.2d 1123, 1126–1127.

The burden of showing that no genuine issue of material fact exists falls upon the party requesting summary judgment and is specified in *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 274:

"The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some *evidence* of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." (Emphasis *sic.*)

■ These principles were reaffirmed in *Vahila v. Hall* (1997), 77 Ohio St.3d 421, 429, 674 N.E.2d 1164, 1170–1171. The moving party is required to state the basis for his motion and then point to "pleading[s], depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any" which support the motion. Civ.R. 56(C). Merely alleging that a nonmoving party lacks evidence does not satisfy this obligation. See *Kulch v. Structural Fibers, Inc.* (1997), 78 Ohio St.3d 134, 147, 677 N.E.2d 308, 318–319.

## II

■ Because its resolution depends upon *Dresher*'s articulation of the movant's initial burden, we shall deal with Myers's second assignment of error first, which states:

"The trial court erred in granting summary judgment for the employer on Plaintiff Myers' claim of negligent retention of supervisor McCarty."

The second count in Myers's amended complaint alleges that Goodwill was negligent in keeping McCarty in a supervisory position throughout the period of Myers's employment, resulting in Myers's injuries. In *Kerans v. Porter Paint Co.* (1991), 61 Ohio St.3d 486, 493, 575 N.E.2d 428, 433, the Ohio Supreme Court held:

"An employer has a duty to provide its employees with a safe work environment and, thus, may be independently liable for failing to take corrective action against an employee who poses a threat of harm to fellow employees, even where the employee's actions do not serve or advance the employer's business goals." See, also, *Venger v. Davis* (Apr. 26, 1995), Summit App. No. 16940, unreported, at 4, 1995 WL 244221.

In its memorandum in support of its motion for summary judgment, Goodwill advanced two arguments. First, Goodwill asserted that "[a]n employee's injury

due to alleged negligence of an employer falls under Ohio's Workers' compensation system and is barred by the exclusivity provisions of the Ohio Revised Code, § 4124.74[3] and § 35, Article 2 of the Ohio Constitution." (Footnote added.) Goodwill's assertion was squarely rejected in *Kerans*, with respect to nonphysical harm and intangible injuries to personal rights.[4] *Kerans v. Porter Paint Co.*, 61 Ohio St.3d at 489–490, 575 N.E.2d at 431–432.

Second, citing *Venger v. Davis* (June 29, 1994), Summit App. No. 16567, unreported, at 4, 1994 WL 286269, Goodwill declared that Myers had no evidence showing that McCarty had a past history of "criminal, tortious or dangerous conduct," and thus failed to carry her burden outlined in Civ.R. 56(E) to set forth specific facts snowing that there is a genuine issue for trial.

As we explained above, a movant's conclusory assertions of no evidence against the nonmovant are insufficient, under *Dresher* and *Vahila*, to support summary judgment in the movant's favor. Since Goodwill has failed to point specifically to Civ.R. 56 evidence demonstrating Myers's utter lack of evidence to support her claim, we must overrule the trial court's grant of summary judgment with respect to Myers's claim of negligent retention. See *Cechowski v. Goodwill Industries of Akron, Inc.* (May 14, 1997), Summit App. No. 17944, unreported, at 16–17, 1997 WL 270523. Myers's second assignment of error is sustained.

## III

Myers's first assignment of error states:

"The trial court erred in granting summary judgment for the employer on plaintiff Myers's claim of sex and age discrimination."

Myers's amended complaint alleges that, while Myers was employed by Goodwill, McCarty harassed her discriminatorily, favoring male employees and younger female employees. Myers's complaint alleges treatment "based on discrimination based on sex and age," "discrimination based on sex," and "discrimination based on age."

R.C. 4112.02 provides as follows:

"It shall be an unlawful discriminatory practice:

"(A) For any employer, because of the *** sex *** of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that

---

**3.** R.C. 4124.74 does not exist. We presume Goodwill referred to the exclusivity provision of R.C. 4123.74.

**4.** Claiming to have suffered emotional distress and stress-related physical injuries, Myers prayed for compensatory damages, punitive damages, litigation costs, court costs, and attorney fees.

person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

Title VII of the Civil Rights Act of 1964, Section 2000e–2(a)(1), Title 42, U.S.Code, prohibits sex discrimination in all "terms, conditions, or privileges of employment." The evidentiary standards applicable to a determination of whether Title VII has been violated apply to a determination of whether R.C. Chapter 4112 has been violated. *Little Forest Med. Ctr. of Akron v. Ohio Civ. Rights Comm.* (1991), 61 Ohio St.3d 607, 609, 575 N.E.2d 1164, 1167, certiorari denied (1992), 503 U.S. 906, 112 S.Ct. 1263, 117 L.Ed.2d 491. Federal case law interpreting Title VII is generally applicable to cases of alleged violations of R.C. Chapter 4112. *Id.*, 61 Ohio St.3d at 609–610, 575 N.E.2d at 1167–1168.

In her memorandum in opposition to Goodwill's motion for summary judgment, Myers characterized her allegations as constituting a single claim of "sex-plus-age" discrimination. Myers does not allege that Goodwill discriminated against all women, but rather that Goodwill disparately treated a subclass of women, which she variously describes as older women and women not considered sexually attractive by McCarty, and which also included younger, sexually desired women who refused McCarty's sexual advances.

In *Arnett v. Aspin* (E.D.Pa.1994), 846 F.Supp. 1234, 1240, the court surveyed United States Supreme Court cases and other federal cases in holding that a "sex-plus-age" cause of action exists under Title VII:

"The reasoning behind the holdings of *Phillips* [*v. Martin Marietta Corp.* (1971), 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613] and its progeny is that when an employer discriminates against members of one sex, the victims of such discrimination should have a remedy under Title VII which expressly prohibits discrimination on the basis of sex. The point behind the establishment of the sex-plus discrimination theory is to allow Title VII plaintiffs to survive summary judgment when the defendant employer does not discriminate against *all* members of the sex. Thus, the above-cited cases have not created a new remedy, but instead have closed a loophole through which defendant employers could escape Title VII liability. As the Court stated in *Jefferies* [*v. Harris Cty. Community Action Assn.* (C.A.5 1980), 615 F.2d 1025], an employer could discriminate against a discrete group of women—large women, black women, women with children, married women, pregnant women, older women—and be granted summary judgment in their favor because they had indeed filled these positions with other women not in the group. Such a result cannot be condoned."

We agree that a cause of action exists for plaintiffs who can show discrimination based upon sex and age.

In her appellate brief, Myers characterizes the treatment to which she was subjected as constituting "adverse employment conditions not imposed on others outside the protected class." In cases brought pursuant to R.C. 4112.02 for "disparate treatment," Ohio courts have adopted the three-step formula set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 802–805, 93 S.Ct. 1817, 1824–1826, 36 L.Ed.2d 668, 677–679, according to which the plaintiff must first prove by a preponderance of the evidence a prima facie case of disparate treatment. That done, the burden shifts to the defendant to provide a legal justification for the differentiation. The plaintiff must then be given the opportunity to prove that the justification was merely pretextual. *Frank v. Toledo Hosp.* (1992), 84 Ohio App.3d 610, 615–616, 617 N.E.2d 774, 777–779.

Myers does not allege discriminatory discharge or failure to rehire, as such. Rather, she alleges that harassment, discharge, and failure to rehire constitute a series of acts that amount to discriminatory treatment. The elements she must prove by a preponderance of the evidence in order to establish a prima facie case are (1) Myers is in a protected class (female and over forty years old), (2) Myers suffered adverse employment action, (3) Myers was qualified for the position she held, (4) comparable, non-protected persons were treated more favorably. See *McDonnell Douglas, supra; Sutherland v. Nationwide Gen. Ins. Co.* (1994), 96 Ohio App.3d 793, 801, 645 N.E.2d 1338, 1343–1344, quoting *Mitchell v. Toledo Hosp.* (C.A.6, 1992), 964 F.2d 577, 582–583 (regarding race and age discrimination); *Brewer v. Cleveland City Schools* (July 10, 1997), Cuyahoga App. No. 71283, unreported, 1997 WL 391346. A plaintiff may show that she and the employees from the non-protected group were similarly situated by establishing that they had the same supervisor, were subject to the same standards, and engaged in the same conduct. *Mitchell v. Toledo Hosp.*, 964 F.2d 577 at 583.

On an appeal from the granting of summary judgment, our first inquiry is whether the successful movant met its burden under *Dresher* "to specifically point to some *evidence* of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims." (Emphasis *sic.*) *Dresher, supra,* 75 Ohio St. 3d at 293, 662 N.E.2d at 274. We find that Goodwill has fulfilled its initial burden under *Dresher* to point to Civ.R. 56 evidence which demonstrates the absence of evidence supporting Myers's claim.

Goodwill does not dispute that Myers can prove that she belongs to a protected group or that she was qualified to perform her job. Goodwill maintains that Myers does not create an issue of material fact concerning whether she was subjected to disparate treatment. The entirety of Myers's evidence concerning her experience of alleged discrimination is contained in her deposition testimony.

From that deposition, Goodwill draws her recollections that McCarty yelled at her to get off the phone during an emergency involving a dying customer, that McCarty "came in and took over" a meeting Myers was conducting with the cashiers, and that McCarty yelled at men who worked as "stock boys." Goodwill argues that since Myers admitted that McCarty yelled at members from the protected and non-protected groups alike, Myers cannot claim that the yelling demonstrates disparate treatment. Further, Goodwill quotes Myers's admission that when the head cashier position was posted, she did not apply for it, even though she was fully aware of it. Hence, according to Goodwill, its failure to hire Myers for the re-created position can hardly be considered an instance of disparate treatment.

Once the movant has supported its motion with appropriate evidentiary materials, the nonmoving party may not simply rely upon the allegations or denials in her pleadings. Civ.R. 56(E). The nonmoving party must present specific facts showing that there is a genuine issue for trial; and if the nonmoving party fails to do so, summary judgment shall be entered in favor of the moving party. *Dresher, supra,* 75 Ohio St.3d at 293, 662 N.E.2d at 273–274.

Even drawing all inferences from the facts in favor of Myers, we find that Myers has failed to present specific facts showing that there is a genuine issue for trial. In her response to Goodwill's motion for summary judgment, Myers makes many references to her deposition testimony to support her claim that she was treated disparately. We arrange Myers's references to evidentiary materials into four parts: McCarty's supervisory treatment of Myers, McCarty's treatment of similarly situated men and younger women, McCarty's role in Myers's discharge, and Goodwill's failure to rehire Myers.

1. McCarty's supervisory treatment of Myers.

Myers summarizes McCarty's harassment of her as consisting of yelling, repeatedly belittling Myers, and making conflicting and demeaning demands.[5] Asked to identify all incidents of harassment she suffered at McCarty's hands, Myers described three. First, McCarty yelled at Myers while Myers was attempting to summon emergency assistance to treat an elderly customer who was apparently dying in the store. Second, McCarty directed Myers to display some leather coats in the store, but did not approve of how Myers displayed them. Third, as cashier coordinator, Myers was conducting a meeting of

---

5. Myers's amended complaint included among the alleged harassment "demands outside of the bounds of reasonable supervisory conduct." When asked whether McCarty ever made demands upon Myers that she felt were outside what he should have been demanding, Myers responded, "Not that I can think of right now."

cashiers, during which McCarty "came in and took over." Defense counsel elicited the following testimony from Myers concerning the incident:

"Q. You indicated that he was putting you down or always putting you down, and if you can, tell me how he was putting you down in this incident. Or did you already tell me, just by taking over?

"A. Well, by taking over and acting like I don't know what I was talking about.

"Q. Anything else?

"A. He made an example out of me, because Kelly Fogel [an assistant manager at the store] had come in towards the end of the meeting. And just his attitude—I mean, she wasn't there for most of the stuff he said, but when she walked in it was like his attitude.

"Q. Like his attitude with what?

"A. With me.

"Q. It was like he had an attitude when she walked in?

"A. It was like I don't know what I'm doing, what I tell the cashiers.

"Q. Did he say you don't know what you're doing?

"A. He's told me in other talks, yes.

"Q. Let's talk about this one.

"A. Not there, no. He has made an example out of me. He was trying to tell the cashiers that he is the boss, if something is wrong and they go to management in the store and they don't do nothing, they go to him, you know, with whatever their complaints are.

"Q. So if they go to a manager and a manager can't help them with the situation he was telling them to then come to him?

"A. Right, but we always helped them.

"Q. I understand.

"A. We turned that store around."

Reading the testimony in the light most favorable to Myers, it appears that, at most, McCarty yelled inappropriately at Myers while she attempted to help the dying customer. Otherwise, McCarty exercised his supervisory duties in a possibly heavy-handed manner with respect to the leather coat display and the conduct of the cashier's meeting. Of McCarty, Myers stated conclusorily that "it was just his attitude" and that "[e]verything is harassing about him. It's just the way he treated me[.]" She was very short on specific facts that arise to harassing behavior.

2. McCarty's treatment of similarly situated men and younger women.

Myers's nonspecificity about the harassment she endured cripples her proof of disparate treatment. Myers relies upon her reference to McCarty's treatment of men and "blondes" in the following exchange as evidence creating an issue of fact regarding McCarty's disparate treatment of her:

"Q. Now, you indicated that that's the way he treated everybody, or yelled at everybody. Tell me what you meant by that.

"A. Well, I can narrow it down. The only ones he didn't do it to—

"Q. Didn't do what to?

"A. The yelling or you can't do anything or you can't make decisions, was Gina Shook. Now, what he did in private, he could have yelled at her. I never seen it in person. He had a lot of faith in the men, and I've never seen him treat any of the blondes that way in the store.

"Q. Blondes?

"A. 'Blondes.'

"Q. What do you mean by 'blondes'?

"A. That is what he likes, skinny.

"Q. You mean a blonde-haired woman?

"A. Yes.

"Q. That was what I was asking. You said a lot of the men. Were there some men he did yell at?

"A. Not that I ever seen.[6] Now, I'm not saying it couldn't happened. I never seen it. [Footnote added.]

"Q. Would you be surprised to know he yelled at a man?

"A. Yes.

"Q. Why do you say that?

"A. Terry had this idea that no woman could run a store. No woman could make a decision without consulting him first.

"Q. No woman?

"A. No woman in that store.

"Q. That includes all women?

"A. No, I'm talking about the women in the store.

---

**6.** Elsewhere in her deposition, Myers reports that Tyrone Birney and other males working with store stock were yelled at by McCarty.

"Q. Including the blondes, or they could run the stores?

"A. They probably could in his eyes."

Myers testified that McCarty bestowed amorous attentions on a "blonde" cashier named Bobbie and a "blonde" assistant manager named Mary Beth Bauhart. When asked to specify what Bobbie received that Myers did not receive, Myers responded, "Well, being respected, being treated like a human being, being treated like I had some intelligence, just being treated nicely." In her response to Goodwill's motion for summary judgment, Myers refers to testimony that after Bauhart's sexual affair with McCarty was over, "he started treating her almost the same way he treated me. And he always tried to plant in my mind that she didn't know how to do anything. I heard that, 'You don't know how to do a damn thing,' and that all her knowledge came from bookworm. What he meant by that, I don't know."

The only example Myers could remember of a male employee being treated better than her involved Barry Parker, who succeeded Myers as security coordinator when Myers became cashier coordinator:

"Q. And so you're saying Terry always compared you to him?

"A. Right.

"Q. Go on.

"A. It was really in a mean, disrespectful manner. As for instance, the time that Terry hired a private investigator and he made the statement to me after he tried to accuse me of making a deal that, 'You know, well, Barry would have done it this way,' or, 'Barry would have hired a private investigator.' I told him, 'I'm not Barry. I'm not like Barry. I don't want to be like Barry. I work in my own way.'

"Q. Tell me how that's an example of a man, Barry, being treated differently?

"A. Barry could do anything he wanted when he was on the clock. Anything he wanted he could do. I never seen Barry ever walking around looking around when he was doing security looking for stashes or watching the cashiers. He was never on the floor. He was always on break. When he wasn't on break, he was standing at register 4 talking to the girls. Terry would walk in there; nothing was said, nothing was said.

"* * * *

"A. No, not before I was there. But I know this: Barry Parker is Terry's spy. Everybody knew that.

"Q. There are lots of spies, because you identified others.

"A. Well, yeah. Well, the pretty ones that he had, girlfriends, yes, they were spies. You know, I mean—

"Q. Okay.

"A. I don't know what else to say."

Myers did not assert that she was punished for conduct for which Barry was not punished.

3. McCarty's role in Myers's discharge.

In her response to Goodwill's motion for summary judgment, Myers asserts that while she was employed as cashier coordinator, she was told by Gina Shook that McCarty was trying "to get rid of you and Tim [head of stock]." Myers testified that Goodwill vice president Ruth Meeks said to Myers that, with respect to the reduction in force, Meeks told McCarty that the decision was his, and that McCarty "was supposed to decide who was going to be laid off."

The inferences to be drawn from Myers's testimony are weakened in light of the fact that Myers does not dispute that her termination was one of several terminations as part of a general reduction in force Goodwill instituted. Myers does not discuss the sex and age of others who were laid off. Myers does not attempt to show that similarly situated employees from non-protected classes were retained. See *Torre v. Casio, Inc.* (C.A.3 1994), 42 F.3d 825, 831. It is also undisputed that Myers's job was eliminated and the duties redistributed to another employee.

4. Goodwill's failure to rehire Myers.

After her termination, Myers worked part-time as a receptionist for Goodwill. During that period, about three to four months after the elimination of the cashier coordinator position, Goodwill posted an announcement of the position of head cashier, which, it is not disputed, was a re-creation of her old position as cashier coordinator. In her response to Goodwill's motion for summary judgment, Myers asserted that personnel director Richard Thatcher told her that McCarty had directed Thatcher to seek a new employee to fill the position. That point is simply not established by Myers's testimony.

Myers argues without further reference to Civ.R. 56 evidentiary materials that "[k]nowing of McCarty's desire to have attractive young women working for him and his abusive treatment of her and older women, knowing that McCarty controlled this position, that he had expressly decided not to notify her of its reinstatement, and that he had repeatedly said he wanted to get rid of her, Myers

quite reasonably concluded that it would have been futile to apply for the position."

The person hired as head cashier was a female younger than Myers. However, no inference can be drawn that these events were adverse to Myers when she never applied for the new position and, shortly after the position was posted, she took a job as a nurse's aide.

In summary, the evidentiary material Myers directs us to does not establish a prima facie case of disparate treatment on the basis of sex and age. Myers's first assignment of error is overruled. The judgment of the trial court is reversed in part and affirmed in part. We remand this cause for proceedings consistent with this opinion.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

DICKINSON, P.J., concurs.

SLABY, J., dissents in part and concurs in part.

SLABY, Judge, dissenting in part and concurring in part.

I dissent in part and concur in part. I would concur with the majority and affirm on appellant's first assignment of error. I dissent and would affirm on the second assignment of error.

The majority has said that the appellee has been properly granted summary judgment on the sex and age discrimination claim against the employee. How then can the appellant show that the employer was responsible for the harm we said didn't exist?