JOURNAL ENTRY AND OPINION DATE OF ANNOUNCEMENT OF DECISION
Plaintiff-appellant Barbara Clow Nelson appeals from the trial court's order granting the motion for summary jugment filed by the defendant-appellee Marymount Hospital. The trial court found that there was no genuine issue of fact on the merits of the appellant's racial discrimination claim.
The appellant, an African-American, received her Associate of Science degree as an accredited records technician (ART) from Cuyahoga Community College in 1974. In 1979, the appellant began working at Marymount in the medical records department and at various times worked as either a medical records analyst or a coder.[1] Prior to her employment at Marymount, the appellant worked at other hospitals and at an agency as an ART performing analysis, abstraction and coding.
When the appellant began her employment in the medical records department at Marymount, the thirty-person department consisted of a director, an assistant director, the ARTs, and clerk-typists. Within the department, the duties of the ARTs were divided into two groups, one group performed the coding tasks and another group was designated as analysts. All coders and analysts were required to be certified ARTs. At this point the appellant did perform some ICD-8 coding[2].
In 1979, when the appellant was hired, there was only one other African-American in the department, Elaine Buford, however, Ms. Buford subsequently left the department. Another African-American, Kathleen Watson, who was an ART, was hired shortly after the appellant. A few years later Beverly Choo was hired as a general clerk.
The medical records department had a succession of directors, but only a few are pertinent for purposes of this appeal[3]. In 1986, Ms. Robin Nelson became the director of the medical records department and, at some point, Ms. Cynthia Brenner was hired as her assistant. In 1991, Ms. Brenner succeeded Ms. Robin Nelson as the director. When Ms. Brenner left the employment of Marymount in 1997, she was succeeded by Mary Herbert, an African-American, who was certified as a Registered Records Administrator (RRA)[4].
When Robin Nelson became the director of the medical records department, she believed that a high school diploma was sufficient to perform the analyst function. The requirement that analysts have ART certification was dropped and the appellant's title was changed to medical records technician (MRT). Since maintaining her ART certification was costly and no longer necessary for her employment, the appellant allowed her ART certification to lapse.
After changing the certification requirement, Robin Nelson hired as clerks three Caucasian women, Kathy Mauk, Christine Fixel and Lois Kasmer, who had only obtained high school diplomas. At some point between 1991 and 1993, a health data analyst (HDA) position was created when the Michael Pine project began. These three women were eventually given the HDA positions.
The Michael Pine project called for the abstracting of data from the medical record. The appellant, as the primary analyst in the department, believed she should have been chosen for a position on the project. The appellant was informed by Ms. Brenner that the criteria for obtaining the position was proficiency at analysis of the charts, the ability to abstract information from the charts, and fast typing. The appellant requested, but was denied this position based upon her typing skills.
The appellant stated in her deposition that she made known her interest in becoming a coder as early as 1988. In 1991, 1994, and 1996 she requested training as a coder. The appellant did not take any coding classes or classes in DRG or CPT from 1988 to 1996. When the appellant discussed becoming a coder with Ms. Brenner, she was told she had to be an ART. The appellant never actually applied for the coder position until 1996.
As instances of preferential treatment, the appellant has asserted that Ms. Fixel, Ms. Kasmer, and Ms. Mauk received three months of Code 3 implementation training. Apparently Code 3 is a computer program used to code charts and, as the appellant acknowledged at a later point in her deposition, Code 3 has other functions such as obtaining information regarding patient information. When the appellant requested the same training, Ms. Brenner responded that the appellant was not an ART and was not eligible for the training. Ms. Brenner stated to the appellant that she would not be able to perform current coding tasks because coding had changed since the appellant had last performed coding. The other women receiving the training were Caucasian and were not, and had not ever been, ARTs.
As another example of preferential treatment, the appellant stated that in 1995 the position assistant in the department was open. Ms. Brenner appointed Ms. Fixel and Ms. Kasmer as alternate supervisors until an assistant was found. The assistant who was eventually hired was an African-American, Mary Herbert.
Marymount posted a coder position for which the appellant applied on February 7, 1996. The closing date for the acceptance of applications was February 6, 1996, but the hospital accepted her application a day late. In the same month, the appellant paid the fee to become re-certified as an ART. The appellant also enrolled and completed a class at Cuyahoga Community College in ICD-9-CM coding. She was not reimbursed for the cost of the class by Marymount.
On October 10, 1996, in a meeting with Ms. Brenner, the appellant was informed that she was to become a coder. The appellant responded that she did not want the position, but rather, she desired to remain in the position of an analyst while she trained to be a coder. Ms. Brenner and Ms. Herbert informed her that if she passed this opportunity she would never be given another. Since she had just completed a refresher course, the appellant was not subjected to a coding exam. The appellant pointed out to Ms. Brenner that she had not taken the CPT, or current procedure terminology, coding class and that the class was not offered until January 1997. The appellant was told she would be trained by her supervisors and the other coders. An extensive written training schedule was drawn up detailing that the responsibility for training the appellant rotated daily between the staff members.
The appellant was also informed by Ms. Brenner at this meeting that due to a change in hospital policy, should she wish to return to her old position, it would not be open to her (Nelson Depo. T. 116, 214). As a result of this meeting, the appellant actually began coding on October 21, 1996. At this time all of the other coders in the department were Caucasian and all of the analysts, save Kathy Watson, were Caucasian.
The appellant stated in her deposition that all coders have variations in the codes they choose to use. At times her questions to the other coders would begin a discussion as to the proper code to use. One coder would tell her one answer and the next day another coder would disagree with the first answer. The appellant became confused, but Ms. Brenner agreed with the coders that the appellant was untrainable. The appellant learned from Beverly Choo, an African-American clerk, that the other coders did not want to help her. When she approached Ms. Brenner and informed her that she could not learn with all of the animosity, the appellant was told to leave them alone and that she would be given the books to assist her.
The appellant overheard a meeting between Ms. Brenner, Ms. Herbert, and three Caucasian coders. Two of the coders threatened to quit rather than train the appellant. Ms. Herbert informed the coders that they had no choice. Once training began, the coders would only assist her on the days to which they had been assigned. Even if the assigned person was away from her desk, another coder would not answer a question. As a result of the coders' complaints, the appellant was told not to disturb them until she had completed a task.
As to the training schedule itself, the appellant stated that it was not always followed precisely. The appellant attended some seminars regarding coding. The appellant used Code 3 programming, the ICD-9 and CPT coding. The three coders with whom the appellant worked all had previous coding experience at other facilities prior to being hired by Marymount. The appellant was told that she had to be 90% proficient on all of the charts after 90 days. While this was the standard in the department, no other coder was held to this standard in such a short time.
The appellant was unhappy because one week after she began her training as a coder, she was told by Ms. Brenner that she was not to ask the other coders questions. The coders complained that they could not finish their own work when they had to answer her questions. Every time she asked a question, the coders went to Ms. Brenner to report her questions. The appellant felt like she was under a microscope and that she was made to feel very stupid.
The appellant acknowledged that she was lent text books to assist her with her training and that there were books on a neighboring desk to which she had access.
Eventually, Ms. Brenner and a woman from human resources met with her regarding her sixty-day evaluation. The appellant did not agree with the evaluation. On her evaluation[5] the appellant received the following marks:
 ability to follow and understand directions poor quality of work poor quantity of work poor ability to fulfill job requirements poor attitude and cooperation good potentialities fair limitations fair
A separate sheet was attached to the evaluation setting forth specific comments under each category. Under the category of quality of work, the evaluation is separated into different types of charts the appellant was required to code. Of the seven types of charts listed, the appellant was rated on seven different types of charts as follows: 1) on the admissions list the appellant was rated satisfactory; 2) on the ROP list the appellant was rated satisfactory; 3) on the ED charts the appellant was rated as fair because she had obtained a 65% accuracy when an accuracy of 95% was expected; 4) on the AMS charts the appellant was rated as poor because she had obtained a 17% accuracy when 95% was expected; 5) on the Inpatient, Obstetric Newborn the appellant was rated as poor because her accuracy on the principal diagnosis was 64%, on the secondary diagnosis 15%, on the procedure code 44%, and only two charts of 39 were entirely correct, an accuracy rating of 95% was expected; 6) on Inpatient, Surgery the appellant was rated as poor because her principal diagnosis was correct in 67% of the cases, the secondary diagnosis was incorrect in some aspect in all of the cases, the procedure code was correct in 44% of the cases, the accuracy rate expected is 95% and none of the nine cases coded by the appellant were correct; and, 7) on Abstracting the appellant was rated as fair because errors continued to occur in areas the appellant had been previously assigned. The appellant was rated as under average when compared to other new employees in the department.
After this evaluation, the appellant's probationary period was extended for thirty days. The evaluation contains a notation that the appellant was to submit a list of areas to Ms. Brenner on which she needed assistance. On December 30, 1996, another meeting was scheduled so that Ms. Brenner and Ms. Herbert could make the schedule for the next thirty days.
On February 5, 1997, the appellant received her final review from both Ms. Brenner and from Miriam Hammond, director of human resources. On this evaluation, the appellant was rated as poor compared to other employees who had been trained in the department. The appellant received the following marks:
 ability to follow and understand directions poor quality of work fair to poor quantity of work poor ability to fulfill job requirements poor attitude and cooperation good potentialities poor
The evaluation stated that the appellant's lack of thorough knowledge of coding foundations and the lack of the ability to apply basic coding principles prohibited her from meeting the standards set for the position. The appellant was found to have difficulty understanding instructions. On the evaluation, the following comment was made:
 Barbara's education as an ART and exposure to the field of medicine through her prior work experience qualify her for the position but she is unable to progress as one would expect for a person with her background. New graduates who have come in to the position in the past with far less hospital experience have progressed more quickly than Barbara. Also Tri-C Medical Records students who have not completed the program have shown more proficiency in their clinical rotations through the department.
Attached to the evaluation is a list of seven different types of charts the appellant was required to code. Under each area there is a statement of the standard to be achieved and the standards actually achieved by the appellant. The standards to be achieved varied between 90% and 99%, but in no instance did the appellant meet that standard: 1) for Correct Visit the standard is 99% accuracy and out of five categories listed, the appellant met the standard in only two; 2) for Admissions List the standard is 95% accuracy and the appellant achieved a 94.28% accuracy rating; 3) for ROP List the appellant achieved an 84% accuracy, but instead of using the standard one minute per chart, the appellant needed 9 minutes 20 seconds; 4) for Emergency Room the evaluation stated that the standard time to code each chart was 4 minutes and the appellant needed 19 minutes and 20 seconds for each chart, overall in this category only 70% of the cases were charted correctly in all areas; 5) for Endoscopy the appellant required 20 minutes per chart instead of the standard 4 minutes and of the six sub-categories listed in this area the appellant's accuracy was not the standard 95%, but rather varied between 33% and 87.5%; 6) for Ambulatory Surgery the appellant required 27 minutes to code each chart instead of 10 minutes, the accuracy required was between 90 and 95%, but in the six sub-categories, the appellant's accuracy varied between 29% and 80%; and, 7) for Inpatient the appellant needed 86 minutes to code an obstetric newborn chart instead of 20 minutes and she needed 56 minutes to code a surgery chart instead of 30 minutes. Again, the standards for the sub-categories varied between 90 and 95% and the appellant's accuracy varied from 5.8% to 88.2%.
At the meeting, the appellant was informed that rather than terminating her employment, the hospital would reassign her to a twenty-hour a week clerical position within the medical records department. The appellant was unhappy with this result and informed the women that: she did not receive the training she should have; that previous coders had a year to train; that one other coder had not even had to code inpatient charts; and, that all she had attempted to do was to better herself and to learn. The appellant asserted in her deposition that other coders made significant numbers of errors. The appellant did not pursue a grievance under the hospital grievance procedure.
Upon her demotion she requested to return to her old position, but she was informed that it was not an option because the position had been filled. Ms. Brenner informed the appellant that she should be happy to have a job, since she could have been terminated completely. The appellant cited instances of others who had left the department, but she failed to present any evidence that these instances occurred after the change in hospital policy.
During her deposition, the appellant made several complaints regarding the standards she was required to meet during her training. The appellant stated that one coder, Ms. Illes, did not code inpatient charts for her first three months and never met the productivity standards. Ms. Illes left for another hospital of her own accord. Marge Corder, a coder from 1994 to 1995, was given a year to train, but left the hospital because she was never given an opportunity to code inpatient charts. The appellant, on the other hand, was required to code inpatient charts as part of her three months training. Additionally, some coders were hired prior to learning the results of their state certification test. Other coders were given a training period of at least a year.
Over the years the appellant filed several complaints with the EEOC. Her complaint regarding her treatment after her return to the main office from the medical floors in 1988 was settled by the hospital. In 1992, the appellant filed a complaint regarding the fact that African-Americans were written up for errors in their work while the Caucasians in the office were not. The appellant dropped this charge. In 1994, appellant filed a complaint because she was disciplined for being one minute late for work while others were not. The EEOC found that another Caucasian person had been similarly disciplined.
In 1996, the appellant filed a complaint regarding her treatment in this instance with the Ohio Civil Rights Commission (OCRC). In the complaint the appellant alleges that she was given a position for which she did not apply, given a poor evaluation, and then given one month to improve, all based upon her race. In response, the OCRC determined that the appellant had, in fact, applied for the coder position; that she had taken a refresher course at CCC and received her ART accreditation prior to the transfer to the position; that the hospital determined that she was not satisfactorily performing her tasks and placed her into a part-time clerical position; and, that there is nothing in the record to show that any newly transferred younger Caucasian coders experienced performance difficulties equal to or worse than the appellant's and were not removed from the position. The OCRC determined that further investigation was unlikely to result in a finding of a violation against the appellant, but that additional information could be submitted within ten days. There is no indication in the record of any further action.
The appellant testified at her deposition that during her entire working experience at the hospital, from 1979 until 1997, comments were made by management personal regarding her race by both Ms. Boggess and Ms. Brenner. The appellant stated that whenever Mr. Trudell's secretary saw her, she would say, Huh, you're still here? Ms. Boggess stated that one African-American in the department was enough and that had she [Ms. Boggess] been the one to make the decision, the appellant would not have been hired. The comment made by Ms. Boggess was not reported to anyone. Ms. Brenner frequently referred to African-Americans as you's people and at times would make a motion as though calling a dog. Ms. Brenner attended office parties to which the African-Americans in the office had not been invited.
The appellant recounted instances where inappropriate behavior from Caucasian employees was tolerated; instances in which African-American employees unfairly had to apologize to Caucasian employees; and, instances where supervisory failed to intervene when African-American employees were not accorded respect from Caucasian employees.
The record contains several disciplinary notices regarding the appellant's work and tardiness between 1980 and 1985, including a two-day suspension in May 1985 for failure to meet productivity standards.
The appellant presented as evidence the deposition testimony of the other African-American employees of the medical records department at Marymount. Each testified of perceived unequal treatment based upon race. There was also evidence that an office clique existed, but one co-worker indicated that the clique was not hostile to the appellant. The testimony of the appellant's African-American co-workers corroborated her claim that other coders were given longer than three months to train.
The appellant left Marymount in May 1997 due to health reasons.
The appellant has set forth one assignment of error:
 THE TRIAL COURT ERRED BY FINDING THAT THERE IS NO GENUINE ISSUE AS TO ANY MATERIAL FACT WHETHER DEFENDANT-APPELLEE MARYMOUNT DISCRIMINATED AGAINST PLAINTIFF-APPELLANT NELSON ON THE BASIS OF RACE IN VIOLATION OF R.C. 4112.02(A) AND GRANTING SUMMARY JUDGMENT TO DEFENDANT-APPELLEE.
The appellant argues that the appellee failed to provide to her on the job training and opportunities for advancement which were granted to similarly situated Caucasian employees. Specifically, the appellant claims that newly hired Caucasian employees were given a position as health data analysts (HDA), and provided additional training, without the HDA position ever having been posted in the department. The appellant asserts that the training the white employees received was the training she sought, but was denied, so that she might become a coder. The appellant states that when she was appointed to the coder position, she was given an abbreviated training schedule and performance criteria which made the successful completion of her training unattainable. The appellant asserts that the Caucasian coders in the department were permitted a much longer training period and that their performance criteria was not so stringent. Finally, the appellant asserts that she was denied promotion based on the fact that her ART certification had lapsed while the Caucasian employees were given promotions without ever having obtained ART certification. The appellant contends that since her supervisors were biased against African-Americans, their evaluations of her job performance were inherently biased and should not be given credence.
The appellee asserts that its actions were not based on racial discrimination because the appellant was promoted to the position she sought, but that the appellant failed to meet the objective standards set for that position. The appellee asserts that the appellant was not placed on the Michael Pine project due to her lack of typing skills, making her an unqualified person to fill the position. Additionally, even though the appellant was not given the title of HDA and placed on the Michael Pine project, she still obtained her goal of becoming a coder.
The appellant counters the appellee's argument by asserting that the appellee's reason is pretextual because the evidence reveals that the department managers continually discriminated against other black employees.
This court reviews the lower court's granting of summary judgments de novo. Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102;Zemcik v. La Pine Truck Sales Equipment (1998),124 Ohio App.3d 581, 585. The Ohio Supreme Court recently restated the appropriate test in Zivich v. Mentor Soccer Club (1998), 82 Ohio St.3d 367,369-70 as follows:
 Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor. Horton v. Harwick Chem. Corp., (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus. The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Dresher v. Burt (1996), 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264, 273-274.
 Once the moving party satisfies its burden, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E). Mootispaw v. Eckstein (1996), 76 Ohio St.3d 383, 385, 667 N.E.2d 1197. Doubts must be resolved in favor of the nonmoving party. Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356, 358-59, 604 N.E.2d 138.
To prevail in an employment discrimination case, a plaintiff must prove discriminatory intent. Mauzy v. Kelly Services, Inc.
(1996), 75 Ohio St.3d 578. A litigant may use either the direct or the indirect method of proof. Byrnes v. LCI Communication HoldingsCo. (1996), 77 Ohio St.3d 125. Ohio courts apply these methods in accordance with federal law. Barker v. Scovill, Inc. (1983),6 Ohio St.3d 146. Under the direct method of proof, a plaintiff may establish a case of discrimination by presenting evidence, of any nature, to show that an employer more likely than not was motivated by discriminatory intent. Mauzy, supra. A causal link or nexus between the discriminatory statements or conduct and the prohibited act of discrimination must be established by the plaintiff.Byrnes, supra.
The appellant herein has not sought to establish her discrimination claim with the direct method of proof. Rather, she has sought to establish her claim under the indirect method of proof, which permits her to establish discriminatory intent through the analysis set forth in McDonnell Douglas Corp. v. Green (1973),411 U.S. 792.
In order to establish discrimination based upon race, this court has held that a litigant must produce some evidence showing race discrimination under the following elements: 1) plaintiff is a member of a racial minority; 2) plaintiff suffered an adverse employment action; 3) plaintiff was qualified for the position; and, 4) a comparable, non-protected person was treated more favorably. Brewer v. Cleveland Bd. of Edn. (1997), 122 Ohio App.3d 378, citing to McDonnell Douglas, supra. Contrary to appellee's assertions, under the disparate treatment test set forth in TexasDept. of Community Affairs v. Burdine, (1981), 450 U.S. 248, there is no requirement that the plaintiff demonstrate that a non-protected person was given the position after the plaintiff left the defendant's employ.
Once the plaintiff has set forth a prima facie case of discrimination, the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that its actions regarding the plaintiff were taken based on legitimate nondiscriminatory reasons. Burdine, supra. The ultimate burden of persuasion remains at all times with the plaintiff. Id.
In the case sub judice, because the appellant is an African-American, the first prong of the disparate treatment primafacie case is proven. McDonnell, supra. The second prong has been met because differences in title and access to training may be considered adverse employment actions. See generally, Sutherland v. NationwideGeneral Ins. Co. (1994), 96 Ohio App.3d 793.
Turning to the third prong, this court must examine whether or not the appellant was qualified for the position. Where a litigant is not qualified for the position, the prima facie case has not been met and summary judgment is appropriate. Neubauer v. A.M.McGregor Home Corp. (1994), Cuyahoga App. No. 65579, unreported, 1994 WL 197221. In Neubauer, this court held that in order to demonstrate qualification for a position, a litigant must not only demonstrate the capability of performing the work, but must also demonstrate that he or she is meeting the employer's legitimate expectations, i.e., that the litigant's performance is up to the standard the employer is entitled to expect from an employee at that experience and responsibility level. The Neubauer court cited to McDonald v. Union Camp Corp. (C.A. 6, 1990), 898 F.2d 1155, 1160
for the proposition that a material issue of fact is not raised by challenging the judgment of the litigant's supervisors. Where an employee is not doing what his employers want him to do, he is not doing his job. Id.
In the case sub judice, the appellant has set forth a host of facts (and innuendos) to support her claim for racial discrimination. However, even though appellant has current credentials as a certified ART, this court must find that the appellant was not meeting her employer's legitimate expectations in the performance of her work as a coder. This is demonstrated by the abysmally poor performance reviews given during her probationary period. Although the appellant contends that her training period was abbreviated and that her performance criteria was more stringent, this does not save the appellant. The appellant was purportedly re-certified as an ART, an indication that she should have already been well acquainted with the tasks set before her without the substantial training given by her employer. The appellant was in a position to understand that the coding function serves the dual purposes of providing statistical information and for billing to the insurance companies for payment to the hospital. Given her years of experience, the appellant was in a position to understand that the responsibility for accuracy placed on a coder was critical to the future financial well being of the hospital.
Lastly, in Brewer, supra, this court held that the determination as to whether a stray comment is actionable race discrimination depends on the following factors: 1) was the comment made by a decision maker; 2) was it related to the decision-making process; 3) was the comment an isolated remark; and, 4) was the comment in proximity to the alleged discriminatory act. After reviewing the record before this court in this particular case, and after applying the test in Brewer, the appellant has failed to show that the comments were more than isolated remarks and has failed to show that any comments were related to the decision-making process.
The appellant failed to present evidence to meet her burden under the third prong of the McDonnell-Douglas test, that she was qualified for the position, because the performance reviews demonstrate, category by category, that the appellant, after re-certification at CCC and after intensive in-house training, did not comprehend the basics of the task before her. The trial court did not err in granting the appellee's motion for summary judgment.
The appellant's assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
KENNETH A. ROCCO, P.J., and PATRICIA A. BLACKMON, J., CONCUR.
 ________________________ JAMES D. SWEENEY, JUDGE
[1] In the medical records field, the review of medical charts is divided into separate functions. These functions are analysis, abstraction, and coding. When analyzing a medical record, an analyst reviews the record to ensure its completeness, i.e., all of the signatures are present. When performing an abstraction, a review is performed which consists of screening and reviewing a medical chart for statistical purposes, i.e., has the patient died or been discharged. Coding is a descriptive means of taking a diagnosis or an operation and assigning it to a number. Coding is done for the dual purposes of insurance billing and statistics.
[2] ICD-8 coding was performed on the chart itself. In approximately 1990, coding became computerized and the conversion to ICD-9 occurred.
[3] The testimony did not reveal exact dates as to when the directors and assistants assumed their positions, so the following dates are the approximations given during the depositions.
[4] An RRA certification is a more advanced certification than an ART certification.
[5] On an evaluation, employees are graded exceptional, good, satisfactory, fair, or poor.