Curtis I. JONES, Plaintiff,

v.

**KILBOURNE MEDICAL LABORATORIES dba Dayton Medical Laboratories, et al., Defendants.**

No. C–3–99–030.

United States District Court,
S.D. Ohio,
Western Division.

Dec. 14, 2000.

814

Dwight Allan Washington, Dayton, OH, for plaintiff.

James Allan Mills, Denlinger, Rosenthal & Greenberg, Cincinnati, OH, Kilbourne Medical Laboratories, Paul Kilbourne, Sr., defendant.

Martin I. Fish, Thomas Michael Poulton, Dayton, OH, for Joseph A. Cogliano, defendant.

DECISION AND ENTRY SUSTAINING MOTION FOR SUMMARY JUDGMENT (DOC. #29) FILED BY DEFENDANTS KILBOURNE MEDICAL LABORATORIES, dba DAYTON MEDICAL LABORATORIES, JOSEPH A. COGLIANO, AND PAUL KILBOURNE, SR., INSOFAR AS SAID MOTION IS DIRECTED TOWARD COUNTS ONE, TWO AND FOUR OF PLAINTIFF'S AMENDED COMPLAINT (DOC. #2); STATE–LAW CLAIM CONTAINED IN COUNT THREE OF PLAINTIFF'S AMENDED COMPLAINT DISMISSED, WITHOUT PREJUDICE TO REFILING IN STATE COURT OF COMPETENT JURISDICTION; JUDGMENT TO BE ENTERED IN FAVOR OF DEFENDANTS AND AGAINST PLAINTIFF ON COUNTS ONE, TWO AND FOUR OF PLAINTIFF'S AMENDED COMPLAINT (DOC. #2); TERMINATION ENTRY

RICE, Chief Judge.

This litigation stems from the termination of the Plaintiff's employment as a Phlebotomy Supervisor for Defendant Kilbourne Medical Laboratories, dba Dayton Medical Laboratories. After his discharge, the Plaintiff filed a four-count Complaint (Doc. #1) and amended Complaint (Doc. #2) against the Defendants,[1] alleging racial discrimination in violation of Title VII and Ohio Revised Code Chapter 4112 (Count I), gender discrimination in violation of Title VII and Ohio Revised

---

1. The Defendants are Kilbourne Medical Laboratories, dba Dayton Medical Laboratories, Joseph A. Cogliano, the Plaintiff's former supervisor at Dayton Medical Laboratories, and Paul Kilbourne, Sr., who owns the facility. (Amended Complaint, Doc. #2).

Code Chapter 4112 (Count II), breach of contract (Count III) and wrongful discharge in violation of public policy (Count IV).[2] Pending before the Court is the Defendants' Motion for Summary Judgment. (Doc. # 29).

## I. *Factual Background*[3]

Defendant Kilbourne Medical Laboratories ("KML") is in the business of drawing and testing biological fluids for medical purposes. The individuals who draw these fluids are known as phlebotomists. (Doc. # 29, Kilbourne affidavit at ¶ 2). On March 1, 1996, KML began doing business in Dayton, Ohio, under the name Dayton Medical Laboratories ("DML"). (*Id.* at ¶ 3). At that time, Paul Kilbourne, the President of KML, hired Joseph Cogliano to run DML.[4] (*Id.*). Shortly thereafter, Cogliano hired Curtis Jones to work as a phlebotomist Supervisor at DML.[5] (Jones depo. at 57, 62; Kilbourne depo. at 69). Jones' responsibilities included performing administrative tasks, drawing blood at various long-term care facilities, delivering blood reports and "[j]ust telling everybody what to do." (Jones depo. at 71–72). Jones performed his job, apparently without incident, through at least approximately March, 1997, when he received a favorable performance review from Cogliano and a pay raise from Kilbourne. (*Id.* at 81–85).

■ In July, 1998, however, Kilbourne received a complaint from Cogliano about Jones' "management style." (Kilbourne depo. at 105). Cogliano informed Kilbourne that "there were a number of people that were going to walk out of the business because of the way [Jones] was talking to them, or yelling at them ... and that the business was in jeopardy, and he was afraid that he wasn't going to have any employees there."[6] (*Id.*). Around that time, DML employee Kathleen Ross informed Kilbourne that "her life was unbearable working in the Dayton Medical Lab." (*Id.* at 107). As a result, Kilbourne allowed her to transfer to KML in Cincinnati, Ohio. (*Id.*). Shortly thereafter, he visited KML and saw Ross. During that visit, she accused Jones of being a racist and said that he had been sexually "offending" employees at DML. (*Id.* at 111). She also told Kilbourne that Jones had made comments about having a gun with him, and that he had said "negative, racist things against white people." (*Id.* at 113).

---

**2.** The Plaintiff's amended Complaint does not make clear which counts are directed toward which Defendants. The four counts refers to the "Defendant" and the "Defendants" interchangeably, without identifying against whom the various allegations are directed. For present purposes, however, the Defendants have presumed that each count is directed toward each Defendant, and the Court will do likewise.

**3.** For purposes of its analysis herein, the Court will construe the facts, and all reasonable inferences drawn therefrom, in a light most favorable to the Plaintiff, the non-moving party. In its analysis, *infra,* the Court will set forth additional relevant facts, once again construing those facts most strongly in favor of the Plaintiff.

**4.** Kilbourne lives and works in Cincinnati, Ohio. (Kilbourne affidavit at ¶ 1).

**5.** DML is an extension of KML, which was opened by Paul Kilbourne in 1972. (Kilbourne depo. at 6, 13, 25–26). Kilbourne also runs a similar facility in Columbus, Ohio. (*Id.* at 17).

**6.** In its recitation of the facts, the Court will mention a number of complaints that Kilbourne received about Jones. Those complaints are not hearsay because they are being used not for the truth of the matter asserted, but for the limited purpose of establishing the grounds upon which Kilbourne based his decision to take an adverse employment action against Jones. *See Bush v. Dictaphone Corp.,* 161 F.3d 363, 367 (6th Cir.1998).

Finally, Ross told Kilbourne that another DML employee, Penni Schwieterman, had been having problems dealing with Jones. (*Id.* at 112). In response, Kilbourne asked Ross to submit her complaints to him in writing and to have Schwieterman do the same. (*Id.*).

Thereafter, Kilbourne received written complaints about Jones from both Ross and Schwieterman. (*Id.* at 114–115, 117–118). In a four-page letter, Ross alleged that Jones had "badgered" her and had accused her of being a racist several times on Feburary 4, 1998. (Doc. # 29, Kilbourne affidavit at Exh. B; Ross affidavit at Exh. A). She stated that Jones' actions had caused her to leave work early and in tears. (*Id.*). She also alleged that on February 5, 1998, Jones and several African–American employees had ignored her. (*Id.*). As a result, she had started crying again and had considered quitting her job. (*Id.*). Ross also wrote that Jones had called her "spoiled," and had said that the African–American employees at DML thought she was a racist. (*Id.*). Additionally, Ross wrote that Jones had said, "I assume your husband is upset with me. He better not come here or I'll kill him." (*Id.*). In her letter, Ross also accused Jones of not telling her about a "timed draw" appointment on February 6, 1998, which nearly caused her to miss the event. (*Id.*). Finally, Ross alleged that she had heard Jones make various comments with racial overtones,[7] and that he considered any criticism of his job performance to be racially motivated. (*Id.*).

In her letter to Kilbourne, Schwieterman accused Jones of engaging in sexual harassment, stating:

Shortly after I started the part-time morning position, Curtis [Jones] sexually harassed me. I wasn't going to make a big thing out of it, but he kept on harassing me about it after the fact. We were talking outside the building during our break and upon entering the building I paused at the women[']s room to enter it. Curtis stroked my right cheek with the back of his hand then told me how good looking I was. Not knowing Curtis that well at the time[,] I just sort of froze and replied, 'I try.' As I started to push the women[']s room door[,] I looked back at him as he continued down the hall and he said I was doing a darn good job of it. I entered the ladies[ ]' room a little confused and he went into the lab.

When I returned to the lab nothing was said and I left for the day since my shift was over. When I got home I was really mad at myself for not setting him straight. I called Helen and Joy (DML employees) and told them what transpired that morning and asked for advi[c]e They both said to tell Joe Cogliano (general mgr.). The next morning[,] Joe told me to handle it myself and talk to Curtis about it. I decided to let it drop and forget about it.

---

7. These comments included, *inter alia:* (1) "A cop might pull us over, seeing a black man driving around a white girl."; (2) "You republicans are all for the white man."; (3) "I won't eat white cheese because it's white."; (4) "Katt, you deliver the south reports—too many rich white folk."; (5) "Katt, you do a good job at the health fairs. So you should do them because some white people have a problem with black's [sic] drawing their blood."; (6) "The white folk sit up in their cozy houses all high and mighty."; (7) "The black folk are treated unfairly every day."; (8) "I got to thinking about the phlebotomy department; Linda, Robin, Alberta, and me are black; you Katt, are white. So are Joe and Helen, but they are not my employees. I got to thinking that I need to hire more white people. That's when I hired Joy." (Doc. # 29, Kilbourne affidavit at Exh. B; Ross affidavit at Exh. A).

Curtis approached me about it soon after that and told me I had no right going to Joe and I should have come to him if I had a problem with it (this was outside in the parking lot). I explained why I went to Joe and why I decided to let it drop. He then told me it was a 'test,' that he didn't stroke my cheek, and that he had heard rumors about me being a backstabber, lawsuit happy, and that he needed to see for himself how far I would take this incident. I tried to tell him he was wrong for what he did and how he was playing with me. He then called Joy over to be a witness to the conversation, kept repeating everything over and over, and asked her opinion (still denying he touched me in the manner that he did). Joy appeared to want to stay out of it.

Curtis brought the matter up on subsequent occasi[o]ns and no matter how I tried to defend myself he said it didn't happen that way and had the nerve to say at one point that 'I made' him do it.

On June 23rd, I broke my leg on the way to my car by slipping on wet pavement. This resulted in surgery. I told Joe and Curtis over the phone it might be a long healing time and agreed with both of them that hiring a replacement was most fe[a]sible.

On July 3rd between 5:30 and 6:30 p.m.[,] Curtis called to check on my progress. We talked for a while then he started again to harrass [sic] me about the above incident. I again tried to set his head straight about it and he still insisted that he had to test me, etc. He then asked if I had a jealous husband and how big he was. I told him that my husband doesn't act on hearsay, knows I'm capable of handling men with an attitude, and told him how big Jim was. Curtis then stated if Jim ever approached him for any reason, that he would feel he would have to shoot him.

I went off. I told him if he ever shot my husband he better kill him because I've seen Jim in an irate mood once and that Jim literally tore a man apart with his bare hands. Curtis then said since Jim wasn't as big as he thought, he would just beat him with his bare hands, and he had the reputation to prove it. He also told me Joe had told him to quit carrying a gun while he was working. Curtis said that there are too many crazy people out there on the streets and he needed protection. As far as I know[,] he's still carrying the gun in his car. We got off the above subject and Curtis said he hoped to see me back at work and to take care of myself. Ironic isn't it?

I haven't spoken to Curtis except when I went to the lab last week to give Joe an update on my progress. Curtis acted very concerned about my injury and wished me a speedy recovery.

One more note, I contacted the Dayton Police about the threatening phone call I received on July 4th. They made out a report over the phone[,] stating [that] since he didn't threaten my husband personally they couldn't arrest Curtis on a formal criminal charge.

No other harassment or threats have been made sin[c]e July 3rd.

(Kilbourne affidavit at Exh. C; Schwieterman affidavit at Exh. A).

After receiving the foregoing written complaints, Kilbourne decided to suspend Jones, pending the completion of an investigation. He informed Jones of the suspension during a phone conversation in late July or early August, 1998. (Kilbourne depo. at 146; Jones affidavit, attached to Doc. # 30 at ¶ 11). At that time, Kilbourne informed Jones that "sexual harassment charges had been brought" against him, but he refused to divulge the

specific nature of the charges or the identity of the accusers. (Jones affidavit at ¶ 11). Additionally, on or about August 9, 1998, Kilbourne and Jones spoke on the telephone, and Kilbourne explained that he wanted to "get all the issues out on the table from both sides, your side and the other parties involved." [8] During that conversation, Kilbourne told Jones that several people had made allegations against him, and that he wanted Jones to "write down" his side of the story. (Jones depo. at Exh. 7; Kilbourne depo. at 128, 141–142, 144, 146; Kilbourne affidavit at ¶ 9). Kilbourne also told Jones that he planned to set up a meeting with a mediator, and that Jones would have an opportunity to discuss the allegations with that person. (*Id.*).

Shortly thereafter, Kilbourne documented the suspension in an undated letter that he faxed to Jones' residence on August 11, 1998. (*Id.* at Exh. D–E). In relevant part, Kilbourne's letter stated:

> ... This suspension is without pay and shall remain in effect until I have a chance to investigate your performance as a supervisor at the Dayton Lab. If it is determined by me that you should be restored to your job, your salary will be paid retroactively.
>
> This action is being taken in response to events that have occurred at the Dayton Lab. There have been several complaints made by some of the female employees concerning your treatment of them, including complaints that you have made physical threats against two employees [sic] husbands. You have been counseled by Joe [Cogliano] in the past concerning your management style, which he has observed to be overbearing and verbally abusive toward a number of

the female employees. You have been told that this conduct is unacceptable in a supervisor, but it has been reported that you have continued with this behavior. You have been argumentative with Joe and other employees. One of the women also has reported that you touched her in an inappropriate way and made inappropriate comments about her appearance. You recently refused to make a run that I requested you to make unless I committed to getting you your W–2 information by a certain time. I had already told you that I would get the W–2 to you as soon as I was able and consider your refusal to make that run as a failure to perform your essential job responsibilities. Some of the matters are in dispute, others are not. All of the conduct alleged is unacceptable behavior in a supervisor and employee of the company.

> I also understand that you also have accused some of the employees of being racist. I am not aware of any facts that support such an allegation, but it does concern me. All of this and more has created a crisis situation at the Dayton Lab which threatens the ability of the Lab to function. I am now in a position where I must take some action.

> In an effort to determine the truth of what is going on, I have asked for the assistance of the NAACP. General Chewy at the NAACP has agreed to conduct an investigation by interviewing you and the other employees of the lab. This will be your opportunity to tell your side of the story and to respond to any complaints concerning your behavior as a supervisor. The meeting with General Chewy will not be an adversarial proceeding, but rather an information gath-

---

**8.** Although the record is not entirely clear, it appears that the August 9, 1998, telephone conversation is the same one in which Kilbourne informed Jones about the existence of sexual harassment allegations.

ering session. You do not have to participate, but I urge you to do so. I am not yet certain of the date or time of the meeting, but I will let you know.

I understand that General Chewy will come to some conclusion about these matters after discussing the issues with all of you. I will take his conclusion and recommendations into account in making my final decision concerning you[r] employment and/or the employment of other Lab employees.

Until these matters are finally resolved, you are not to return to the Dayton Medical Laboratory. I am willing, however, to allow you to continue to work for the company out of the Franklin and Hamilton areas as a phlebotomist. Your rate of pay will be reduced by $ .35 to $8.90 per hour. During this period of time you will not have any supervisory authority over any employees. Please let me know if you wish to return to work under these conditions. (*Id.* at Exh. D).

Thereafter, on August 18, 1998, Jones responded in writing, through his attorney, to the allegations made against him. Specifically, his attorney sent a letter to Kilbourne's counsel, stating:

... With respect to the reason(s) that my client was relieved of his job duties on August 3, 1998, it is my understanding that the "current" thrust of the allegation(s) revolve[s] around his management style as opposed to any claim of harassment. Additionally, it is my understanding that several employees have alleged that Jones carries a hand gun to work and maintains same in his vehicle. I discussed each of these allegations with Jones in depth; and Jones was absolutely flabbergasted regarding those allegations. Jones uncategorically de-

nies each and every allegation associated with threats, violence or the bringing of a hand gun on company premises at any time.

Simply, as indicated to you yesterday I hoped your investigation would fairly and objectively interview all current and former employees knowledgeable of the situation as well as former employees. It is our position that Jones was wrongfully removed from his job without any justification whatsoever.

... It is also my understanding ... that your investigation will be concluded no later than the end of the following week (August 28, 1998).

(Jones depo. at Exh. 6). In this letter, Jones' attorney also rejected Kilbourne's offer to let him work in Franklin and Hamilton at a reduced rate of pay, pending the completion of the investigation.[9] (*Id.*).

Despite Kilbourne's promise of an investigation, including a meeting with a representative of the NAACP, he never set up such a meeting, and Jones never heard anything about an investigation. (Kilbourne depo at 176; Jones depo. at 148). Kilbourne canceled the meeting with the NAACP after discovering, contrary to his original belief, that the organization was not a state agency. Thereafter, he never spoke with or contacted any of the employees at DML, he never sought a written statement from any employees other than Ross and Schwieterman, and he never reviewed any personnel files. (Kilbourne depo. at 125, 156, 180–182, 224–226). Although Ross had provided Kilbourne with the names of other employees who allegedly could confirm her allegations, Kilbourne did not contact any of them. (*Id.* at 195–196). He also never sought a written statement from Jones' supervisor, Joe

---

9. Jones' counsel explained that the offer of interim employment was "untenable" because it required a long daily commute. (Jones affidavit at Exh. 6).

Cogliano. (*Id.* at 156). As of August 18, 1998, Kilbourne deemed his investigation to be "open," even though he had not obtained any information beyond the two original written complaints from Ross and Schwieterman. (*Id.* at 199). According to Kilbourne, he did not take any action to pursue his "internal investigation" because Jones was "holding up the show." (*Id.*). Specifically, Kilbourne insisted numerous times in his deposition that his investigation had stalled, because he was waiting for Jones to provide a written response to the various allegations made against him. (*Id.* at 125, 128, 130, 180, 200). Without such a response, Kilbourne insisted that he was incapable of proceeding. (*Id.*). Kilbourne made this claim despite having received the written denial from Jones' attorney on August 18, 1998,[10] and despite previously having promised Jones that a meeting with an NAACP mediator would constitute his opportunity to tell his "side of the story and to respond to any complaints concerning [his] behavior as a supervisor[.]" After Kilbourne sent the letter containing this promise, he refused to meet with Jones, despite the fact that he previously had agreed to do so. (Doc. # 30, Jones Affidavit at ¶ 30). According to Kilbourne, his internal investigation remained on indefinite hold, while he waited to "g[e]t something" in writing from Jones. (Kilbourne depo. at 204).

After Jones rejected the offer of interim employment in Franklin and Hamilton, however, Kilbourne perceived him as having resigned from DML.[11] (*Id.* at 204–205). Jones then informed Kilbourne, through counsel, on August 28, 1998, that he intended to seek "legitimate employment elsewhere[.]" (*Id.*). Less than one month later, Jones began working as a phlebotomist for Franciscan Medical Center at a rate of $8.22 per hour.[12] (*Id.* at 182). After Jones left DML, Kathleen Ross, who is white, and Linda Burnside–Thompson, an African–American, became "co-supervisors" of the phlebotomists in the Dayton office. (Burnside–Thompson affidavit at ¶ 8). The appointment of co-supervisors resulted from a disagreement between Cogliano, who favored Ross, and Kilbourne, who favored Burnside–Thompson.[13] (*Id.*). On September 25,1998, Burnside–Thompson voluntarily resigned from her position at DML. (Doc. # 32, Cogliano affidavit at ¶ 2).

Jones commenced the present litigation on January 27, 1999. (Complaint, Doc. # 1). He subsequently filed an amended

---

**10.** In addition, Jones denied the allegations orally over the telephone when Kilbourne first informed him of his suspension. Consequently, it appears that Kilbourne was well aware of Jones' position regarding the allegations.

**11.** As noted, *supra*, Kilbourne's letter stated that Jones was suspended, without pay, pending the completion of an investigation into the allegations against him. It also stated that he would be reinstated, with back pay, if the investigation proved favorable to Jones. Finally, as an alternative to being suspended without pay, the letter offered Jones an opportunity to work in Franklin and Hamilton until Kilbourne's investigation was completed. However, it did not require him to do so, as a condition of preserving his employment. (Jones depo. at Exh. 4).

**12.** Jones made $9.25 per hour before being suspended from DML. (*Id.* at 183). However, the employee benefits at Franciscan are better than those provided by DML. (*Id.* at 183–185).

**13.** In his affidavit, Cogliano contends that Burnside Thompson was appointed as "Phlebotomy Supervisor" and that Ross was made "Assistant Phlebotomy Supervisor" and served under Burnside–Thompson. (Doc. # 32, Cogliano affidavit at ¶ 1). Similarly, Kilbourne explained during his deposition that, after Jones' departure, Burnside–Thompson became the Supervisor of DML and Ross returned from Cincinnati to serve as the Assistant Supervisor. (Kilbourne depo. at 240).

Complaint on February 26, 1999. (Doc. # 2). Pending before the Court is a Motion for Summary Judgment filed by Kilbourne Medical Laboratories, dba Dayton Medical Laboratories, Joseph A. Cogliano and Paul Kilbourne, Sr. (Doc. # 29).

## II. *Summary Judgment Standard*

The Court first will set forth the parties' relative burdens once a motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial[,]" quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 [6th Cir.1987] ). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evi-

dence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law under Fed.R.Civ.P. 50. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Service, Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). Rather, Rule 56(e) "requires the non-moving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.' " *Hancock v.*

*Dodson,* 958 F.2d 1367, 1374 (6th Cir. 1992). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure* § 2726.

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ...."), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, upon only those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

## III. *Racial Discrimination (Count I)*

In Count I of his amended Complaint, Jones alleges that the Defendants took an adverse employment action against him because of his race, in violation of Title VII and Ohio Revised Code § 4112.02. As a means of analysis, the Court first will address the potential liability of Defendant KML, dba DML, under both state and federal law. The Court then will address the potential liability of Defendants Paul Kilbourne, Sr., and Joseph Cogliano.

### A. *Liability of Defendant Kilbourne Medical Laboratories, dba Dayton Medical Laboratories*

A plaintiff pursuing race discrimination claims under Title VII and Ohio Revised Code § 4112.02 may prevail in one of two ways: by presenting either direct or indirect evidence to prove that his employer (here KML) was motivated by a race-based animus when it took an adverse employment action against him.[14] Absent direct evidence of discrimination, a plaintiff must proceed under the burden-shifting, indirect evidence approach set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that framework, Jones bears the initial burden of establishing a prima facie case of employment discrimination. *Mitchell v. Toledo Hosp.,* 964 F.2d

---

14. With one exception regarding potential individual liability (which will be discussed, *infra* ), discrimination claims under state and federal law are subject to the same analysis. As a result, Ohio courts have recognized that "federal case law interpreting Title VII of the Civil Rights Act of 1964, Sections 2000e et seq., Title 42, U.S.Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Sutherland v. Nationwide Gen. Ins. Co.,* 96 Ohio App.3d 793, 799, 645 N.E.2d 1338 (1994), citing *Plumbers & Steamfitters Comm. v. Ohio Civil Rights Comm.,* 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (1981).

577, 582 (6th Cir.1992), citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. To establish a prima facie case, he must show: (1) that he is a member of a protected class; (2) that he was qualified for his position; (3) that he suffered an adverse employment action; and (4) that for the same or similar conduct he was treated differently than similarly-situated non-minority employees *or* that he was replaced by someone outside of the protected class. *Id.; see also Laderach v. U–Haul of Northwestern Ohio,* 207 F.3d 825 (6th Cir. 2000). If he seeks to compare himself to other "similarly-situated" employees, Jones must show that these "comparables" are similarly-situated "in all of the relevant aspects." *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998), quoting *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir. 1994). In other words, similarly-situated employees generally "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell,* 964 F.2d at 583.

If Jones establishes a prima facie case, an inference of discrimination will arise. The burden of production then will shift to KML, which will be required to articulate a legitimate, non-discriminatory reason for his suspension and/or discharge. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If KML articulates such a reason, Jones then will bear the burden of proving (or, in the present context, demonstrating a genuine issue of material fact) that the stated non-discriminatory reason

for the adverse employment action against him is pretextual. *See Mitchell,* 964 F.2d at 584 n. 6. Specifically, Jones will be required to show that the asserted reason has no basis in fact, that the reason did not actually motivate the adverse employment action, or that it was insufficient to motivate such action. *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1084 (6th Cir.1994); *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (holding that a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification was false, may permit fact finder to conclude that the employer unlawfully discriminated).

Bearing the foregoing standards in mind, the Court concludes that Jones cannot establish a prima facie case under *McDonnell Douglas,* and he lacks any direct evidence that KML took an adverse employment action against him because of his race. With respect to the indirect-evidence approach, the Defendants do not dispute that Jones is a member of a protected class (African–American) or that he suffered an adverse employment action.[15] The Defendants only contest Jones' ability to establish the other two elements of his prima facie case. *First,* they contend that he was not "qualified" for his position because he has "admitted to several incidents of serious misconduct, including talking about killing employees' husbands, inappropriate sexual contact with a subordinate, and yelling or raising his voice to several DML employees." (Doc. # 29 at 19). *Second,* the Defendants contend that Jones was replaced by another African–American after he left DML, and that he

---

**15.** The parties do dispute whether Jones quit his job or whether he was terminated. For present purposes, however, this dispute is immaterial. The parties agree that Paul Kilbourne suspended Jones without pay, and the Defendants concede that such a suspension constitutes an adverse employment action.

was not treated less favorably than any similarly situated non-minority employees. (*Id.* at 19–20).

█ Upon review, the Court cannot agree that Jones has failed to establish the "qualified" element of his prima facie case. It is undisputed that Cogliano worked with Jones before the two men joined DML. Consequently, Cogliano was familiar with Jones' skills and abilities well before he hired Jones to work as a Phlebotomy Supervisor for DML. Furthermore, Jones worked at DML, apparently without incident, until shortly before his suspension. In fact, his only performance review of record is a favorable one. In light of this evidence, a reasonable trier of fact could find that Jones was "qualified" for his job with DML.

The alleged misconduct upon which the Defendants rely to argue otherwise is the same misconduct that purportedly led to Jones' suspension. In *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651 (6th Cir. 2000), the court recently rejected the argument advanced by the Defendants herein. In *Cline,* the Sixth Circuit reasoned that, when assessing whether a plaintiff is "qualified" for purposes of his or her prima facie case, "a court must examine plaintiff's evidence *independent of* the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Id.* at 661 (Emphasis added). In the present case, the Defendants contend that Jones suffered an adverse employment action because he threatened two employees' husbands, engaged in sexual harassment and berated his subordinates. As *Cline* makes clear, this evidence becomes relevant only if Jones first establishes a prima facie case, and the Defendants cannot rely upon it to argue that he was not "qualified" for his position. A contrary rule would allow the Defendants to short-circuit Jones' case at the prima facie stage, thereby depriving him of an opportunity to demonstrate that his alleged misconduct is a pretext for race discrimination. *Id.* at 660–666.

█ With respect to the final element of Jones' prima facie case, however, the Court finds the Defendants' argument to be persuasive. As set forth above, Jones must present evidence demonstrating that, for the same or similar conduct, he was treated differently than similarly-situated non-minority employees, *or* that he was replaced by someone outside the protected class (i.e., a non-minority). In his amended Complaint, Jones only alleges that he was treated differently than similarly-situated white employees. He *does not* allege that he was replaced by a person outside of his protected class. (Doc. # 2 at ¶ 23–27). In their respective Memoranda, however, the parties have addressed both methods of establishing a prima facie case under *McDonnell Douglas.*

The Defendants initially argue that Linda Burnside–Thompson, an African–American, replaced Jones after his departure from DML. During his deposition, Kilbourne testified that he placed Burnside–Thompson in Jones' former position as the Phlebotomy Supervisor, and that Kathleen Ross transferred back to DML from the Cincinnati office to serve with Burnside–Thompson as the Assistant Supervisor. (Kilbourne depo. at 240–241). Kilbourne explained that he named Burnside–Thompson as the Supervisor because she previously had served with Jones as the Assistant Supervisor and, therefore, she "was next in line." (*Id.* at 241). Kilbourne's testimony is consistent with an affidavit from Joseph Cogliano, who avers that Burnside–Thompson took Jones' place as Phlebotomy Supervisor, and that Ross was named as Assistant Phlebotomy Supervisor. (Doc. # 32, Cogliano affidavit at ¶ 1). Cogliano also avers that Burnside–Thomp-

son remained in her position as Phlebotomy Supervisor until she voluntarily resigned on or about September 25, 1998. (*Id.* at ¶ 2).

In opposition to the foregoing allegations, Jones has provided the Court with an affidavit from Burnside–Thompson, who avers: "After Curtis [Jones] was no longer employed at DML, I was made co-supervisor of the phlebotomists, along with Kat Ross. The process of me becoming a co-supervisor was confusing in that the owner of DML, Paul Kilbourne, Sr., and Joe Cogliano disagreed. Joe did not want me to become co-supervisor." (Doc. # 30, Burnside–Thompson affidavit at ¶ 8). Relying solely upon this averment, Jones argues that he was replaced by Ross, a white employee, and not Burnside–Thompson. In his Memorandum, Jones reasons as follows:

> Seemingly, the most troublesome factor under *McDonnell Douglas/Burdine* is the fourth element as to whether Jones was replaced by a person outside of the protected class. Purportedly, Jones was immediately replaced by a black female (Thompson) who held the position for about thirty (30) days. It is undisputed that *both* Thompson and Ross were made co-supervisors by Cogliano. (Aff'd Thompson ¶ 8). Ross, in reality, performed Jones' duties prior position [sic] in all respects and Thompson's promotion was merely a sham. At best, Thompson's length of time is not significant enough to qualify [as a replacement] under the traditional test. Simply, the installation of Thompson for a minuscule period of time did not break the chain of events sufficiently to conclude that Jones was replaced by someone within the protected class.
>
> After Jones' dismissal in August[,] 1998, Ross was brought back from the Cincinnati lab and became "co-supervi-

sor" along with Thompson. (Aff'd Thompson ¶ 8). Cogliano wanted Ross to replace Jones and did not want Thompson acting in the capacity of supervisor. (Aff'd Thompson ¶ 8)[.] Upon Thompson's departure, Ross remained supervisor without assistance. In actuality, Ross replaced Jones as supervisor at DML.

(Doc. # 30 at 12).

Upon review, the Court finds Burnside–Thompson's averment insufficient to establish a genuine issue of material fact on the "replacement" element of Jones' prima facie case for at least two reasons. *First,* Burnside–Thompson avers in conclusory fashion that she and Ross served as "co-supervisors." This statement neither refutes nor contradicts the Defendants' contention that Burnside–Thompson served as Phlebotomy Supervisor and Ross served as Assistant Supervisor (i.e. "co-supervisors"). Burnside–Thompson provides no explanation of her responsibilities or authority vis-a-vis the position occupied by Ross. The mere fact that she and Ross served as "co-supervisors" does not, without more, raise a genuine issue of material fact as to whether Jones was replaced by someone outside of the protected class. *Second,* Burnside–Thompson avers that Cogliano and Kilbourne disagreed about who should supervise DML. According to Burnside Thompson, Cogliano favored Ross, whereas *Kilbourne favored her.* (Doc. # 30, Burnside–Thompson affidavit at ¶ 8). This averment is particularly noteworthy because it was Kilbourne, *not* Cogliano, who served as the decision maker with respect to Jones' termination. (Doc. # 29, Cogliano affidavit at ¶ 8, 13). Accepting Burnside–Thompson's averment as true, Kilbourne (the individual who allegedly discriminated against Jones based on his race) favored her, an African–American, as Jones' replacement and op-

posed the promotion of Ross, a white employee. Even if a trier of fact could infer from Burnside Thompson's affidavit that she and Ross shared power equally as "co-supervisors," the fact that Kilbourne chose her over Ross as a replacement for Jones dispels any possible inference of race discrimination that otherwise might arise from Kilbourne's decision to suspend and/or to discharge Jones.[16] In addition, Jones provides absolutely no evidentiary support for his assertion that Burnside–Thompson's appointment as Phlebotomy Supervisor was a "sham." The Court also finds no evidence (and Jones cites nothing) in the record to refute the Defendants' evidence that Burnside Thompson *voluntarily resigned* from her supervisory position. Consequently, the fact that her tenure as Phlebotomy Supervisor was relatively short-lived does not support an inference that her appointment was a ruse to hide race discrimination. In short, the record reveals that Kilbourne took an adverse employment action against Jones and then put Burnside–Thompson, another African–American, in his place. Under such circumstances, Jones cannot establish that he was "replaced" by someone outside of his protected class, even if Burnside–Thompson shared her authority with Ross.

 Additionally, Jones cannot demonstrate a genuine issue of material fact as to whether he was treated less favorably than similarly situated non-minority employees. In his Memorandum opposing summary judgment, Jones seeks to compare himself to Joseph Cogliano, his direct supervisor

at DML. (Doc. # 30 at 14). Upon review, however, the Court concludes that Jones and Cogliano are not valid "comparables." In order to satisfy the final element of his prima facie case, Jones must show that he and Cogliano are similarly situated "in all of the relevant aspects." *Ercegovich,* 154 F.3d at 352, quoting *Pierce,* 40 F.3d at 802. The Sixth Circuit has recognized that similarly situated employees generally "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell,* 964 F.2d at 583.

In the present case, the Defendants argue that Jones and Cogliano are not similarly situated because Cogliano held a higher supervisory position than Jones. (Doc. # 32 at 7). Cogliano answered to Kilbourne, whereas Jones worked under the supervision of Cogliano. Although the Court does not dispute this point, Jones' attempt to compare himself to Cogliano fails for another reason: the record is devoid of evidence indicating that Cogliano and Jones "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell,* 964 F.2d at 583. As set forth more fully, *supra,* Kilbourne received detailed written complaints about Jones from Ross and Schwieterman. The women accused him of, inter alia, inappropriate physical contact, threatening to kill their husbands, carrying a gun to work,

16. Neither party has cited, and the Court has not located, any factually analogous case law. The Court notes, however, that the purpose of the prima facie case requirement is to force a plaintiff to set forth facts which create a rebuttable presumption of discrimination. *See, e.g., Cline,* 206 F.3d at 660. In the present case, the facts surrounding Kilbourne's ap-

pointment of Burnside–Thompson as a Supervisor simply do not give rise to a presumption that he discriminated against Jones on the basis of race. As set forth more fully above, Kilbourne took an adverse employment action against Jones, but then supported another African American employee to be his replacement.

commenting on Schwieterman's appearance, and causing Ross to cry. The record is devoid of evidence suggesting that Kilbourne ever received the same or similar complaints about Cogliano. Consequently, Jones has failed to raise a genuine issue of material fact as to whether he was treated less favorably than a similarly situated person outside of the protected class,[17] and he cannot satisfy the final element of his prima facie case.[18]

Finally, the Court finds unpersuasive Jones' argument that he possesses direct evidence of race discrimination. In support of this argument, Jones cites what he perceives as direct evidence that Ross and Schwieterman, and possibly Cogliano, were racist. (Doc. # 30 at 14–15). This evidence includes: (1) Ross' use of the word "nigger"; (2) Ross' reference to Jones as a "black son of a bitch"; (3) the telling of "racist" jokes by Cogliano, Ross and Schwieterman; (4) Schwieterman's paranoia about being followed by blacks; (5) Ross' admission that she is a racist; (6) the use of racial slurs by Cogliano, Ross and Schwieterman; and (7) a statement by Ross that African–Americans "make me prejudice[d]." (Doc. # 30 at 15). The foregoing evidence does not constitute direct evidence of race discrimination for two reasons. *First,* Jones' evidence requires the Court *to infer* from it that he was suspended/terminated because of his race. Consequently, it does not constitute "direct evidence" of race discrimination with respect to the adverse employment action taken against him. *Second,* Jones' evidence, which pertains to statements and jokes made by Ross, Schwieterman and Cogliano, does not constitute any evidence (direct or indirect) that Kilbourne, the decision maker with respect to his termination, discriminated against him on the basis of his race. *See Bush v. Dictaphone Corp.,* 161 F.3d 363 (6th Cir.1998) (recognizing that " 'statements by nondecisionmakers ... [cannot] suffice to satisfy the plaintiff's burden ...' of demonstrating animus"). Absent evidence that Kilbourne made such statements or, at a minimum, that he was aware of the racial comments and jokes allegedly made by Ross, Schwieterman and Cogliano (and no such evidence exists), those remarks cannot possibly be used as evidence that Kilbourne was motivated by racial animus when he took an adverse employment action against Jones. *Cf. Oldham v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 124 F.3d 198, 1997 WL 572087 (6th Cir. Sept.12, 1997) (reasoning that discriminatory remarks made by non-decision makers do not support an inference of discrimination absent evidence that the decision maker had heard the remarks).

Based upon the foregoing analysis, the Court concludes that Defendant Kilbourne Medical Laboratories, dba Dayton Medical Laboratories, is entitled to summary judg-

**17.** During his deposition, Jones testified that Cogliano sometimes engaged in "racist" conduct. In his Memorandum, Jones contends that Kilbourne never disciplined Cogliano for engaging in such conduct. Consequently, he argues that Kilbourne treated him less favorably than Cogliano. (Doc. # 30 at 14).This argument fails because Jones presents no evidence indicating that employees ever complained to Kilbourne about inappropriate behavior by Cogliano. The absence of such complaints is a "differentiating circumstance," even if Cogliano did engage in inappropriate workplace behavior. *Mitchell,* 964 F.2d at 583 (noting that employees are similarly situated only if they "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it").

**18.** Given Jones' inability to establish a prima facie case, the Court need not address KML's proffered non-discriminatory reason for his termination or the issue of pretext.

ment on Count I of Jones' amended Complaint (Doc. # 2). Construing the facts and all reasonable inferences in a light most favorable to Jones, the Court finds no genuine issue of material fact as to whether KML took an adverse employment action against him on the basis of his race, in violation of either Title VII or Ohio Revised Code § 4112.02.

### B. Liability of Defendants Paul Kilbourne, Sr., and Joseph Cogliano

■ Defendant Paul Kilbourne, Sr., is entitled to summary judgment on Jones' Title VII and Ohio Revised Code § 4112.02 race discrimination claims for the same reasons set forth more fully above. In short, Jones has not established a prima facie case of race discrimination against Kilbourne, and he lacks any direct evidence of such discrimination. Kilbourne is also entitled to summary judgment on Jones' Title VII claim because individuals with supervisory control over a plaintiff cannot be held personally liable under the statute. *Wathen v. General Electric Co.*, 115 F.3d 400, 404–405 (6th Cir.1997) (finding no "individual capacity" liability under Title VII).

■ Pursuant to *Wathen*, Defendant Joseph Cogliano is also entitled to summary judgment on Jones' Title VII claim. Under Ohio law, however, supervisors such as Cogliano are subject to individual liability if they unlawfully discriminate against their employees. *Genaro v. Cent. Transport, Inc.*, 84 Ohio St.3d 293, 703 N.E.2d 782 (1999). As a matter of law, such liability cannot attach to Cogliano, however, because it is undisputed that he did not take the adverse employment action against Jones. As set forth above, the decision maker with respect to Jones'

suspension/termination (the adverse employment action at issue in the present litigation) was Kilbourne, who based his decision upon the complaints from Ross and Schwieterman. Given that Cogliano took no adverse employment action against Jones, he is entitled to summary judgment on Jones' state-law race discrimination claim.[19] Based on the foregoing reasoning, the Court concludes that Defendants Paul Kilbourne, Sr., and Joseph Cogliano are entitled to summary judgment on Count I of Jones' amended Complaint (Doc. # 2).

### IV. Sex Discrimination (Count II)

In Count II of his amended Complaint, Jones alleges that the Defendants discriminated against him on the basis of his gender, in violation of Title VII and Ohio Rev.Code § 4112.02. In his Memorandum opposing summary judgment, however, Jones indicates that he no longer wishes to pursue this claim. (Doc. # 30 at 18). Accordingly, the Defendants' Motion for Summary Judgment (Doc. # 29) will be sustained, insofar as it relates to Count II of Jones' amended Complaint.

### V. State–Law Claim of Wrongful Discharge in Violation of Public Policy (Count IV)

■ As a means of analysis, the Court turns next to Count IV of Jones' amended Complaint, which alleges wrongful discharge in violation of Ohio public policy. (Doc. # 2 at ¶ 37–39). This cause of action stems from the Ohio Supreme Court's recognition of a common law cause of action in tort when an employee is discharged for a reason that violates the public policy embodied in a statute. *See, e.g., Painter v. Graley*, 70 Ohio St.3d 377, 639 N.E.2d 51

**19.** Although Jones believes that Cogliano is a racist, that assertion, even if true, provides no basis for holding Cogliano liable under § 4112.02 for the adverse employment action taken by Kilbourne, who relied upon written reports provided by Ross and Schwieterman.

(1994). In the present case, the public policy at issue is found in Title VII and Ohio Revised Code § 4112.02, both of which prohibit an employer from taking an adverse employment action on the basis of race. Given that the Defendants are entitled to summary judgment on Jones' Title VII and § 4112.02 race discrimination claims, however, they are also entitled to summary judgment on his public policy claim. Accordingly, the Defendants' Motion for Summary Judgment will be sustained, insofar as it relates to Count IV of Jones' amended Complaint.

### VI. State–Law Claim for Breach of Contract (Count III)

 In Count III of his amended Complaint, Jones sets forth a breach of contract claim against the Defendants. (Doc. # 2 at ¶ 32–36). This claim is distinct from the discrimination claims discussed above. It involves a purported agreement between Cogliano and Jones for the transfer of DML stock from the former to the latter. Having found the Defendants entitled to summary judgment on Jones' Title VII claims (the only federal-law claims contained in his amended Complaint), the Court hereby declines to exercise its supplemental jurisdiction over this state-law claim. It is well settled that a district court may decline to exercise supplemental jurisdiction over state-law claims once it has dismissed all claims over which it possessed original jurisdiction. *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 233 (6th Cir.1997). Indeed, the Sixth Circuit has recognized that if all federal claims are dismissed before trial, remaining state-law claims generally should be dismissed as well. *Id.; see also Taylor v. First of Am. Bank–Wayne*, 973 F.2d 1284, 1287 (6th Cir.1992). Consequently, Jones' state-law breach of contract claim (Count III) will be dismissed, without prejudice to refiling in a state court of competent jurisdiction.[20]

### VII. Conclusion

Based upon the reasoning and citation of authority set forth above, the Defendants' Motion for Summary Judgment (Doc. # 29) is sustained, insofar as it relates to Counts I, II and IV of the Plaintiff's amended Complaint (Doc. # 2). The Defendants' Motion for Summary Judgment (Doc. # 29) is not ruled upon, insofar as it relates to the state-law claim contained in Count III of the Plaintiff's amended Complaint (Doc. # 2). The state-law claim contained in Count III is hereby dismissed, without prejudice to refiling in a state court of competent jurisdiction.

Judgment will be entered in favor of the Defendants and against the Plaintiff on Counts One, Two and Four of the Plaintiff's amended Complaint (Doc. # 2).

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**20.** In its analysis, *supra,* the Court disposed of the Plaintiff's state-law race discrimination claim under § 4112.02 and his common law "public policy" claim only because those causes of action essentially paralleled the Title VII race discrimination claim contained in Count I. Given the substantial similarity of those claims, judicial economy counsels in favor of resolving them together. The Plaintiff's breach of contract claim, however, is factually distinct from Jones' discrimination claims. Consequently, in the exercise of its discretion, the Court declines to exercise supplemental jurisdiction over it.